L. W. PICKETT, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pickett v. Commissioner
Docket No. 6012-72.
United States Tax Court
T.C. Memo 1975-33; 1975 Tax Ct. Memo LEXIS 338; 34 T.C.M. (CCH) 213; T.C.M. (RIA) 750033; February 26, 1975, Filed James S. Byrd, for the petitioner. Robert J. Shilliday, Jr., for the respondent. DRENNEN
DRENNEN, Judge: Respondent determined deficiencies in petitioner's Federal income taxes and additions to tax under section 6653(b), I.R.C. 1954, as follows: Addition to tax Year
Deficiency
under sec. 6653(b)
1959
$ 8,342.82
$4,171.41
1960
13,792.03
8,596.77 [1]
1961
4,427.45
2,213.73
1962
3,375.37
1,687.69
*339 In his answer respondent pleaded in the alternative to the addition to tax under section 6653(b), additions to tax for the years 1960 and 1961 for late filing of the returns for those years under section 6651(a), I.R.C. 1954, in the amounts of $3,124 and $221.37, respectively; and for negligence and intentional disregard of rules and regulations under section 6653(a), I.R.C. 1954, in the amounts of $859.68 and $221.37, respectively. In his opening brief respondent conceded that no part of the underpayment of tax required to be shown on petitioner's returns for the years involved was due to fraud. At the outset we wish to state that the manner in which this case was brought before this Court has made it extremely difficult for us to arrive at a satisfactory conclusion of the case. The revenue agent who audited petitioner's returns for the years here involved completed *340 and submitted his report in 1963. For some unexplained reason the notice of deficiency, based on that report, was not issued until April 27, 1972. The petition, which was filed July 24, 1972, was apparently prepared by petitioner himself and was in bare bones form, alleging no facts in support of the errors assigned, and did not plead the statute of limitations as a defense. Respondent did not move with respect to the inadequacy of the petition but in his answer, filed October 31, 1972, alleged facts upon which the deficiency determination was based in support of his allegation of fraud. Counsel for petitioner filed an entry of appearance on March 8, 1973, but no reply was filed until June 27, 1973, after respondent had moved, pursuant to Rule 18(c), Rules of Practice, United States Tax Court, that the undenied allegations in his answer be deemed admitted. The statute of limitations was not raised as a defense in the reply, and upon inquiry by the Court at the beginning of the trial, counsel stated that there was no issue with regard to the statute of limitations, but with no explanation. The record contains no evidence of waiver by petitioner of the statutory limitation period for *341 issuance of a notice of deficiency. At the beginning of the trial a stipulation of facts was filed, which consisted primarily of a recitation of the formation of the various organizations formed by petitioner and his two joint venturers to promote the establishment and development of the country club complex in suburban Maryland out of which sprang petitioner's tax troubles here involved, statements of various payments made to petitioner by checks drawn by the various corporations, and attached to which were photostatic copies of some of these checks and bank statements reflecting deposits and withdrawals in various bank accounts in the Washington, D.C. area opened in the name of petitioner or his wife. The evidence offered by petitioner during the trial consisted of the testimony of petitioner and various witnesses produced by petitioner with respect to events that had taken place 12 to 15 years prior to the time of trial. Because of events which will be recited in our findings of fact, the entire country club development and all of its books and records had been taken out of the hands of petitioner and his two compatriots in 1961 and could not be located or produced at the time *342 this proceeding was instituted nor at the time of trial. [2] While all of the material events took place in the Washington area, the trial was conducted in Florida, where petitioner had been living for some time. The evidence offered by respondent during the course of the trial was the testimony of the revenue agent who conducted the audit of petitioner's returns for the years here involved. He had little direct recollection of the details of his audit or the records he examined or the people he interviewed. He testified from his work papers which, without objection *343 from petitioner, were received in evidence to prove various entries on the books of the corporations upon which he had based his determination of unreported income received by petitioner. He testified that he charged as income to petitioner all checks drawn by any of the organizations payable to petitioner and all checks drawn by any of the organizations payable to third parties for hotel bills, travel, entertainment, etc., in which petitioner's name was in any way connected, despite the fact that petitioner was the principal salesman of the project. Of course, the agent's work papers did not contain any other information from the books and records of the organizations which might have been favorable to petitioner. Under the rules of this Court petitioner has the burden of proving error in respondent's determination of the underlying deficiency, particularly where respondent does not have to prove fraud to lift the bar of the statute of limitations, but under the circumstances here present we do not believe that burden should be as heavy as in the more normal case. With that in mind, we have *344 made the following findings of fact and conclusions based thereon. The only issue for decision is whether respondent correctly determined petitioner's taxable income for the years 1959-1962. FINDINGS OF FACT The stipulated facts are so found. Petitioner, Leroy W. Pickett, was a resident of Winter Park, Fla., at the time of filing of the petition herein. During the years 1959 through 1962, petitioner was engaged in real estate sales, legal gambling activities, the promotion of country clubs--primarily by the sale of individual club memberships to persons who wished to join the promoted clubs--and the management of club and other income-producing activities. For the taxable years 1959 and 1962, petitioner filed his Federal income tax returns with the district director of internal revenue in Baltimore, Md. For the taxable years 1960 and 1961, petitioner filed his Federal income tax returns with the district director of internal revenue in Richmond, Va. Petitioner's return for 1960 was filed August 31, 1961; his return for 1961 was filed April 30, 1962. Respondent mailed the notice of deficiency in the case at bar on April 27, 1972. Petitioner was married December 31, 1960, to *345 Dolores Hope Pickett. Dolores Pickett filed separate Federal income tax returns for the taxable years 1960 and 1961 with the district director of internal revenue in Richmond, Va. Dolores worked part-time for a radio station in Arlington, Va., during 1960 and 1961. She had no income or receipts other than those reported on her returns for 1960 and 1961. In early 1959, petitioner and two individuals named Bill M. Allen and Troy V. Post, Jr., began promotion of a country club project to be located about 6 miles north of Rockville, Md. On July 10, 1959, Pickett, Allen, and Post caused three corporations to be formed under Maryland law: Lakewood Country Club, Inc. (Lakewood), Lakewood Management Corp. (Management), and PAP, Inc. (PAP). On August 26, 1959, the three caused incorporation of Country Club Developers, Inc. (Developers), under District of Columbia law. During 1959 they also incorporated Pioneer Point Associates, Inc. (Associates), under Maryland law. Pickett, Allen, and Post were the sole shareholders, officers, and directors of Management, PAP, and Developers; petitioner owned a one-third interest in each. Petitioner, Allen, and Post owned one-fifth interests in Associates. *346 Lakewood was organized as a nonprofit membership corporation under Maryland law to be the country club. PAP was incorporated to hold the land on which the Lakewood Club was to be built. On September 1, 1959, PAP leased that land from a corporation called Glen Hills Club Estates, Inc., for a 50-year term at rental of $15,000 for the first year and with an option to buy. The same day, Lakewood leased the club property from PAP for 3 years at annual rental of $60,000 without option to buy. Management's purpose was to manage, direct, and operate Lakewood's club facilities. To that end, Lakewood entered into a management contract with Management and authorized Management to draw checks on Lakewood's bank accounts. Developers was incorporated to promote and develop the club project and facilities. Associates was formed as a country club project to be located on Maryland's eastern shore. The only funds received by Management, PAP, and Developers were from Lakewood. Post was an attorney practicing in Washington, D.C., and was the attorney for the venture. He was also in charge of the books and records of the various organizations. Allen became president of both PAP and Developers. *347 Pickett was the sales manager for the project. Various other people were employed to keep the books and records and handle the internal affairs in the office. One office served as the office for all of the organizations. During the latter part of 1960, and part of 1961, petitioner was actively engaged in the promotion and sale of memberships in Lakewood. Petitioner also promoted sales of property and club memberships for Associates. Petitioner received commission income from Lakewood during each year from his own sale of memberships and also received commission overrides on the sale of memberships by other salesmen. All salesmen working under petitioner were paid on a straight commission basis; petitioner's override was approximately 25 percent of each commission. Generally, the full-time salesmen were paid by check. Part-time salesmen were often paid in cash by petitioner, who would be reimbursed by Lakewood or Developers. The leading salesman for each week was awarded a suit for his efforts, and salesmen were also given golf equipment as incentive awards. The weekly suits and the golf equipment were occasionally paid for by petitioner, with reimbursement by one of the corporations. *348 When petitioner was reimbursed by check for cash payments to salesmen, the check would often also include petitioner's override commissions and reimbursement for other expenses as well, such as the taking of a salesman to lunch or the cost of the suit for the top salesman of the week. Petitioner's promotional activities necessitated extensive entertainment and travel expenses. Petitioner was continually entertaining prospective members individually and in groups. The corporations here involved--Lakewood and Developers--also acquired tickets to professional football games of the Washington Redskins for use by advisors and customers. In the course of promoting the country club, it was necessary for petitioner to travel to Houston several times, to Florida several times to consult with professional golfer Sam Snead, who was to stand in an advisory position to the club, and to the Greenbriar, in West Virginia, several times to consult with Snead's assistant, Gary Nixon. One of the Lakewood-related corporations leased a car on a full-time basis which was used solely by petitioner. Petitioner owned a car which he used for his personal affairs. The corporations also leased cars for the *349 use of persons coming into the Washington, D.C., area with whom the corporations had business dealings. The corporations maintained parking space at the Washington Garage for office parking and for the use of clients and customers. The explicit policy and practice of the corporations was not to pay nonbusiness, personal expenses of any officer, including petitioner. In 1960, Lakewood did pay $6,505.67 to the Finger Contract Supply Co. for furniture for an apartment in Arlington, Va., shared by Pickett and Allen. However, Pickett reported half of the amount so paid, $3,252.83, on his 1960 Federal income tax return as management fees received from Lakewood. The promotional effort in which petitioner was engaged for Lakewood was successful: In all, Lakewood received about $1.5 million in membership subscriptions, and Pickett, Allen, and Post enlarged the club, its facilities, and its projected memberships. It was the plan of Pickett, Allen, and Post to pay for as much of the club as possible from membership fees, and then to obtain a construction loan large enough to complete construction and purchase the property underlying the club. By early 1961 a golf course, tennis courts, swimming *350 pools, and two-thirds of the clubhouse had been completed, and the project had received a commitment for a construction loan to complete the project. The plan never came to fruition, however. Post, who, as an attorney, had been responsible for the corporations' legal affairs, had not secured a certificate of tax-exempt status for the club from respondent. In consequence, respondent asserted deficiencies and additions to tax against Lakewood of about $500,000, and placed a tax lien in that amount on the club's assets. The threat of the tax lien caused promised financial backing to evaporate. A short time later, it emerged that Pickett, Allen, and Post no longer had title to the stock of any of the corporations they had established surrounding the club venture. In an effort to obtain outside financing, the three had endorsed their stock certificates and placed them in escrow with Post, for use as security if financing were to become available. For reasons left somewhat obscure by the record, and unbeknownst to Pickett and Allen, Post then sold the stock from escrow to a third party. Civil litigation ensued, at the end of which, in February 1962, ownership of Lakewood was turned *351 over to the club members, the management contract between Lakewood and Management and the construction contract between Lakewood and Developers were canceled, the sublease agreement between Lakewood and PAP, Inc., was canceled, and the underlying lease of the property upon which the club was located was vested in Lakewood. In 1959, Post deposited in his own client account a payment of $100,000 from Lakewood intended to be a prepayment for construction and commission costs. Neither Pickett nor Allen knew the money was going into Post's account until after it was done. Both subsequently asked Post to return the money to Lakewood or to Developers; but Post did not do so. In 1959, however, Post did make a payment of $25,000 from his client's account to Funkhouser Industries, Inc., for the transfer to Associates of waterfront property on Maryland's eastern shore. On January 29, 1960, Pickett received a check for $2,000 as a loan from Post's client account. The loan was subsequently repaid. Petitioner received no other disbursements from the $100,000 placed by Post in his client account. Promotion of the Associates country club project was not successful. In 1962, Associates was insolvent. *352 Throughout the years at bar, but particularly during 1961 and 1962, petitioner gambled heavily at horse racetracks in the vicinity of Washington, D. C. Petitioner financed his gambling activities largely by loans from third parties or by kiting funds through several bank accounts. Petitioner would often write a check to obtain a wagering stake and then make a cash deposit of either wagering proceeds or loans from third parties in an attempt to cover the check before it cleared the bank's accounting system. Respondent's examination of the corporations with which petitioner was involved began in 1961. In 1962, respondent's agent, Charles Brimmer, began auditing petitioner's returns for the years at bar. Brimmer's report covering petitioner's returns and indicating that deficiencies should be determined was submitted in September 1963. The notice of deficiency was issued April 27, 1972. Brimmer had no explanation at trial for the nearly 10-year gap between submission of his report and issuance of the notice of deficiency. Nothing in the record suggests that petitioner waived the limitations on assessment and collection of tax imposed by section 6501, I.R.C. *353 1954, or that petitioner falls within any of the exceptions to such limitations provided by the same section. In making his determination of deficiencies in petitioner's Federal income taxes for the years 1959 and 1960, and in part for the year 1961, Brimmer relied heavily on the books and records of the corporations with which petitioner was involved in the transactions surrounding promotion of the Lakewood club and on records pertaining to Post's client account. Attribution of some income to petitioner in the years above was induced by Brimmer's disallowance of business expense deductions claimed by the corporations. Brimmer examined the invoices retained by the corporations and found that they rarely held sufficient information, in his opinion, to substantiate deductions to the corporations. Where the invoices were signed by petitioner, Brimmer treated them as made for petitioner's benefit and included them in petitioner's income. Invoices from an auto leasing company indicated that the rented car was at petitioner's disposal; in Brimmer's opinion the corporate records did not show that the car was required for business purposes, and Brimmer therefore attributed all lease payments *354 as income to petitioner. Brimmer made little or no attempt to seek verification of his reconstruction of petitioner's income as above beyond the books and records noted above; Brimmer had two meetings with petitioner to discuss petitioner's taxes in September 1962 and February 1963 but had little or no independent recollection of those meetings or of the substance of the books and records from which he drew his conclusions. The actual books and records in question are not in the record; with petitioner's stipulation, only Brimmer's worksheets made in 1962 or 1963 with reference to those documents were produced before the Court. On his Federal income tax return for 1959, petitioner reported gross income of $9,213.23 as follows: Commissions received
M. T. Broyhill & Sons Corp.
$ 498.35
W.P.C. of New York
54.00
Lakewood Country Club, Inc.
8,660.88
$9,213.23
Petitioner claimed itemized business deductions of $804.47 for hotels, travel, and entertainment. Respondent's notice of deficiency charged petitioner with unreported income for 1959 as follows: Description, Source
Amount
Commission income, Billy M. Allen
$ 430.00
Management and advisory fees,
Developers
7,814.78
Personal expense payments by
Developers or Lakewood
411.12
Other income, Troy V. Post, Jr.
account
8,333.33
Total
$16,989.23
*355 In addition, respondent disallowed the itemized business deductions claimed by petitioner. The record contains two checks, showing petitioner as payee, signed Bill M. Allen, and bearing the notation "Commission," of $225 (dated April 30, 1959) and of $205 (dated May 1, 1959). Brimmer's worksheets for 1959 attributed as income to petitioner $411.12 in expenses originally charged to Lakewood or Developers. The expenses appear on the worksheets as seven checks with one of the corporations as payor and as payees the Mayflower Hotel, Clothing Corp. of America, Washington Garage, Diners Club, and Gaslight Club. The amounts paid range from $16.80 to $109.95. Brimmer's worksheets for 1959 also showed as income to petitioner 34 checks or other receipts totaling $17,028.01, and ranging in amount from $20 to $2,000. All but four of these checks are in the record. According to the worksheets, ten checks totaling $7,700 were shown on Developers' books as management and advisory fees and were not reported on petitioner's 1959 Federal income tax return. One check of $114.78 was shown as from Developers and "Payable to Harry Gresner, Pro." One receipt item of $498.35 was listed as a commission *356 from M. T. Broyhill & Sons Corp., and was shown as reported by petitioner. One receipt item of $54 was listed as a commission from Washington Planning Corp. and was shown as reported by petitioner. Twenty-one checks were shown as commissions from Lakewood reported as income by petitioner. These checks totaled $8,660.88 and varied in amount from $20 to $1,010. On his Federal income tax return for 1960, petitioner reported gross income of $16,740.82, as follows: Salary, Developers
$ 9,214.00
Commissions, Developers
3,210.00
Management fees, Lakewood
4,316.82
Total
$16,740.82
Petitioner claimed itemized business deductions as follows: Hotels & travel
$ 531.66
Entertainment & Promotion:
Exchange Club
$ 73.75
Gaslight Club
399.45
Bethesda Country Club
538.18
Miscellaneous
1,094.28
2,105.66
$2,637.32
Respondent's notice of deficiency charged petitioner with unreported income for 1960 as follows: Description, Source
Amount
Commission income, Lakewood
$ 1,941.76
Management and advisory fees,
Developers
6,515.98
Personal expense payments by
Developers or Lakewood
4,508.41
Other income, Troy V. Post, Jr.,
account
7,798.47
$20,764.62
*357 In addition, respondent disallowed in full the itemized business deductions claimed by petitioner and disallowed a claimed capital loss deduction of $800. Brimmer's worksheets for 1960 attributed to petitioner as income 55 expense items totaling $5,572.40 originally charged to Developers. These items ranged in amount from $3.32 to $450 and showed a variety of payees, including the Mayflower Hotel, American Airlines, American Express, the Shoreham Hotel, Diners Club, and Washington Garage. According to the worksheets, many of the items were accompanied by remarks in the appropriate corporate books, such as "auto exp.," "Sales Pro," and "travel." One item, $40.18 shown as paid to Dominion Electric Supply, carried the notation "Light fixtures for" and gave petitioner's apartment number. The worksheets for 1960 showed 17 checks as salary to petitioner from Developers. The total amount of these checks was $7,496.39. Federal taxes withheld were $1,573.52, and FICA payments were $144, so that gross wages were $9,214. Sixteen checks, ranging from $50 to $700 and totaling $3,210 were shown as commissions from Developers. Seven checks or other receipt items ranging from $161.12 to $2,500 *358 and summing $6,515.98, were shown as management fees from Developers. Notations for the above items showed one item of $475.67 payable to Diners Club, one of $18.28 payable to Hertz, and one of $713.56 payable to American Express. The worksheets for 1960 also showed as income to petitioner: $7,798.47 in commissions and sums paid to petitioner or for his benefit from Troy V. Post's client account (no check or other documentation for this item is in the record or shown on the worksheets); six checks in amounts from $3.76 to $675, totaling $1,571.26, shown as commissions from Lakewood; one item of $1,063.99 shown as a management and advisory fee from Lakewood; two items, of $3,252.83 and $370.50, shown as petitioner's half of amounts spent by the corporations for furniture and decoration in the apartment occupied by Pickett and Allen. Brimmer subtracted the sum of $1,063.99 from his total to avoid possible duplication. On his Federal income tax return for 1961, petitioner reported gross income of $4,100 and claimed deductions as follows: Automobile
Parking
$240.00
Gas repair and depreciation
500.00
$740.00
Interest
Bank of Bethesda
72.00
Household Finance
117.19
189.19
Travel expense
Air lines
417.78
Hotel
480.49
889.27 [3]
Medical
444.61
Business expenses
Exchange Club
40.00
International charge
45.00
Recorder
25.50
Telephone
290.00
Charles Scott
13.47
Cooper Trent
9.60
American Express
1,248.63
Real estate bond &
license
110.00
Commissions
William E. Daugherty
100.00
Robert O. Buffkin
200.00
2,082.20
Total
$4,345.27
*359 In 1961 petitioner received loans as follows: Lender
Amount
William C. Pickett
$1,475
Raymond J. Briscuso
250
Robert A. Bock
200
$1,925
On her Federal income tax return for 1961, Dolores Hope Pickett reported gross income of $1,725 and Federal income tax withheld of $299.60. Dolores Hope Pickett also paid $51.75 for F.I.C.A. employee tax withheld in 1961, so that her net take-home wages for 1961 were $1,373.65. Respondent's determination of petitioner's income for 1961 in his statutory notice of deficiency was based largely on the bank deposits method. Respondent determined petitioner's total bank deposits for 1961 to be as follows: Name of bank
Petitioner
Wife
Arlington, Va.;
Arlington Trust Co.
$3,122.30
$2,375.03
Old Dominion Bank
6,266.00
Washington, D.C.;
First National Bank
1,094.00
--
Union Trust Co.
362.00
--
Bank of Commerce
3,160.00
--
Bethesda, Md.;
Bank of Bethesda
780.00
--
Totals
$8,518.30
$8,641.03
Respondent determined petitioner's net bank deposits for 1961 as follows: Gross receipts deposited in bank
$17,159.33
Less: Non-taxable items
Loan proceeds
1,650.00
Bank transfers
310.00
Net wages--D. Hope Pickett
1,373.65
Total (net bank deposits)
$13,825.68
*360 To obtain his determination of petitioner's unreported income for 1961, respondent added $1,234.68 he had determined to be payment by Lakewood or Developers of petitioner's personal expenses, and deducted the $4,100 petitioner had reported as income on his 1961 Federal income tax return. The result was a determination of $10,960.36 as petitioner's unreported income for 1961. Respondent also disallowed deductions of $4,345.27 claimed by petitioner for 1961. Respondent's determination of petitioner's taxable income for 1961 totaled $13,960.36, after allowance of a $500 standard deduction. Brimmer's worksheets for 1961 attributed as income to petitioner ten expense items originally charged to Developers. These items varied from $14.47 to $250 and totaled $1,234.68. The payee of one was petitioner. The other payees were of much the same character of those of the corresponding items in 1959 and 1960. Copies of the bank account records of petitioner and his wife introduced into evidence confirm respondent's determinations of the couple's total deposits for 1961 and 1962 (see infra) but also show that petitioner carried on an abnormally high volume of banking activity. As indicated *361 supra, in 1961, five checking accounts were, for varying periods, maintained in petitioner's name. Three of the five were opened in 1961; four were closed in that year. In 1962 petitioner had three checking accounts in his name, two of which were closed during that year. Petitioner drew many checks on his accounts, often writing several per day, and made frequent deposits. Checks and deposits tended to be in small amounts. Petitioner's accounts were often overdrawn; when his accounts were closed, the immediately preceding balance tended to be either small or negative. Petitioner's checking account with the Bank of Bethesda in 1961 exemplifies his banking practices during 1961 and 1962. The account carried over from 1960 a balance of $272.08; it was closed on or about February 21, 1961. During the account's existence in 1961, petitioner wrote 56 checks on it; 12 of which were returned for insufficient funds. The account had six entries showing an overdrawn balance. Only two checks were for amounts greater than $75. Days on which more than one check was drawn on the account were as follows: January 4, five; January 9, four; January 10, eight; January 12, three; January 13, two; January *362 16, four; January 17, four; January 18, two; January 19, three; January 23, two; January 24, five; February 2, two; February 6, two. Petitioner made six deposits totaling $780. The smallest was $50; only one was over $200. In all accounts in petitioner's name in 1961, there were 28 deposits of $75 or less, totaling $1,354.30; in accounts in petitioner's wife's name there were 15 deposits of $75 or less, totaling $483.03. In 1962 there were 13 deposits of $75 or less, totaling $572.50 in petitioner's checking accounts and 14 such deposits, totaling $657.50, in petitioner's wife's accounts. The above banking activity confirms our finding, supra, that in 1961 and 1962 petitioner was substantially engaged in attempting to "kite" funds through his and his wife's bank accounts in desperate efforts to finance his gambling activities. On his Federal income tax return for 1962, petitioner reported gross income of $8,500 received in connection with the liquidation of Lakewood. Petitioner also reported a business loss of $1,361.66 in connection with the United Realty Co., 1025 Connecticut Avenue, N.W., Washington, D.C., as follows: Gross receipts
$1,557.78
Operating expense:
Travel
$760.05
Steno services
35.36
Bonds & fees
71.00
Telephone
270.30
Supplies
101.22
Postage
25.00
Promotion
200.00
Parking
175.00
Taxi
100.00
Artwork
100.00
Entertaining prospects
316.94
Auto expense:
Gas, oil & repairs
239.51
Washing
60.00
Car rental
600.00
Total
899.51
85% business use
764.57
764.57
Total expenses
2,919.44
2,919.44
Net loss
($1,361.66)
*363 In 1962 petitioner received loans as follows: Lender
Amount
William C. Pickett
$ 275.00
Warren M. Lockwood
750.00
Patrick Gregg
100.00
William R. Teunis
500.00
James C. Martin
900.00
Bank of Bethesda
2,696.31
Total
$5,221.31
In his notice of deficiency respondent computed petitioner's total bank deposits for 1962 as follows: Name of Bank
Husband
Wife
Arlington, Va.
Arlington Trust Co.
--
$5,299.10
Old Dominion Bank
--
1,727.00
Washington, D.C.
First National Bank
$ 610.00
--
Bethesda, Md.
Bank of Bethesda
2,560.00
--
State National Bank
3,477.50
--
Hyattsville, Md.
Suburban Trust Co.
--
535.00
$6,647.50
$7,561.10
Respondent determined petitioner's net bank deposits for 1962 as follows: Gross receipts deposited in bank
$14,208.60
Less: Non-taxable items
Loan proceeds
4,946.31
Bank transfers
485.00
Total
$8,777.29
To reach his determination of petitioner's unreported income for 1962, respondent subtracted from the above figure the $1,557.78 petitioner had reported on his 1962 tax return as gross receipts from the "United Realty Co.," yielding $7,219.51. Respondent *364 disallowed deductions of $2,919.44 claimed by petitioner for 1962 and disallowed $500 claimed as a standard deduction, but allowed a $1,000 capital loss deduction. Respondent's determination of petitioner's taxable income for 1962 was thus $9,638.95. As stated supra, the bank records of petitioner and his wife for 1962 confirm respondent's bank deposits computations but also show that petitioner was substantially engaged in attempting to "kite" funds through the accounts in question. ULTIMATE FINDINGS OF FACT Petitioner realized gross income and sustained deductible business expenses in the taxable years 1959 through 1962 as follows: Year
Gross Income
Deductions
1959
$19,446.61
$ 764.25
1960
18,552.07
2,505.45
1961
12,234.41
4,345.27
1962
7,579.79
2,773.47
Petitioner failed to file timely Federal income tax returns for the taxable years 1960 and 1961, but respondent has failed to carry his burden of proof that such failure was due to willful neglect and not to reasonable cause. Respondent has failed to sustain his burden of proof that any part of any underpayment of tax for any year at issue was due to negligence on the part of petitioner. *365 OPINION We are faced in this case with the task of computing petitioner's income and certain of his deductions for the years 1959 through 1962. Respondent initially asserted that petitioner was liable for the addition to tax for fraud under section 6653(b), I.R.C. 1954. [4] Respondent has abandoned that contention, however. The facts before us fit a tragic mold. In early 1959 petitioner was 28 years old, unmarried, and working as a salesman of real estate and securities in the Washington, D.C., vicinity, in which he had been born and raised. In that year, petitioner and two others, Bill M. Allen and Troy V. Post, Jr., conceived and embarked upon the project of establishing a country club north of Rockville, Md., to serve the Washington area. Petitioner, placed in charge of salesmen promoting the club and selling memberships in it, threw himself into the effort, and it prospered, yielding about $1.5 million in membership subscriptions over a period of about 2 years. The three organizers reevaluated and expanded their original plans, expanding *366 the club, its facilities, and projected membership. In 1961, however, the endeavor suddenly foundered, so far as concerned the three promoters. Post, a lawyer, was the attorney for the club and several other corporations formed in connection with the promotional effort, and although he had caused creation of the club as a nonprofit membership corporation under Maryland law, he had not obtained certification by respondent that the club was an exempt organization for Federal income tax purposes. In consequence, respondent asserted deficiencies and additions to tax against the club of about $500,000 and placed a tax lien in that amount on the club's assets. Pickett, Allen, and Post had intended to pay for construction of as much of the club as possible from the membership fees collected in the initial promotion of the club and then to obtain a construction loan large enough to complete the facilities and purchase the land on which the club was located. Respondent's lien, however, caused promise of financial backing to evaporate. In addition, Pickett, Allen, and Post had lost title to the stock in the various corporations. The three had endorsed their stock certificates and placed *367 them in an escrow account with Post, for use as security for possible financing. Unbeknownst to the other two, however, Post had sold the stock from escrow to a third party. (Earlier, in 1959, Post had diverted $100,000 from the club to his own clients' account. Although Pickett and Allen both asked him to return the money to the club, he did not do so. Post did subsequently pay $25,000 of that sum for the benefit of one of the club-related corporations and disbursed $2,000 as a loan, later repaid, to petitioner. Post disbursed another portion of the $100,000 to Allen at some point. The ultimate disposition of the remainder does not appear in the record.) Civil litigation ensued, apparently brought by, or on behalf of, the club members. By consent decree, Pickett, Allen, and Post were divested of their legal relationship to the club. Ownership was turned over to the membership. Pickett, Allen, and Post all subsequently left the Washington area. At the time of trial, Pickett was residing (the record does not state his present occupation) in Winter Park, Fla., Post was an attorney in Birmingham, Ala., and Allen was in the insurance business with Post's father in San Antonio, Tex.
*368 As we stated at the outset of this opinion, respondent's unexplained delay of 9 years in issuing the notice of deficiency in this case and the resulting lack of any reliable evidence from which we could determine the true facts have made it very difficult for us to attempt to determine petitioner's correct taxable income for the years here involved, particularly in light of the fact that respondent has rather arbitrarily attributed as income to petitioner all payments made by the country club project to petitioner and all payments of bills with which petitioner had any connection, while at the same time allowing petitioner virtually no business expense deductions. Respondent, also rather arbitrarily we think, charged as income to petitioner for 1961 and 1962 practically all deposits in the various bank accounts of petitioner and his wife, despite the fact that perfunctory examination of those bank accounts would tend to support petitioner's testimony that he withdrew small amounts from those accounts almost every day to bet on the horses and then redeposited funds he won or borrowed the same day or the following day in order to cover the checks he had withdrawn. We turn now to *369 year-by-year analysis of petitioner's taxable income. 1959
Respondent determined Pickett's unreported income in 1959 to be as follows: Payor
Amount
Developers
$7,814.78
Bill Allen
430.00
Personal expense payments
by Developers or Lakewood
411.12
Payment from Troy V. Post, Jr.,
client account
8,333.33
Total
16,989.23
According to Brimmer's worksheets, one item in the total determined paid by Developers was a check of $114.78 payable to "Harry Gresner, Pro;" we treat this item with the alleged payments of petitioner's personal expenses, infra. The remaining payments from Developers took the form of ten checks, ranging in amount from $100 to $2,000 and which, according to the worksheets prepared by Brimmer in 1962 or 1963, were listed on Developers' books as management and advisory fees. The receipts from Bill Allen came in two checks of $205 and $225, each bearing the notation "commission." Petitioner's testimony, which we find credible, was that he often received checks which were, in large measure, reimbursement for his own disbursements, to salesmen working under him, for various valid business purposes. Because petitioner reported in *370 full the checks received from Lakewood, we conclude that the checks from Developers were those intended primarily as reimbursement. According to petitioner's testimony, the reimbursement checks covered three general items: Reimbursement for incentive awards to salesmen, reimbursement for salesmen's commissions paid in cash by petitioner, and petitioner's override commissions on those commissions. The record indicates that petitioner's override amounted to 25 percent of the commission involved, but provides no accurate basis for determining the portion of the Lakewood checks properly attributable to salesmen's incentive awards. Following the rationale of Cohan v. Commissioner,39 F. 2d 540, 543-44 (C.A. 2, 1930), we conclude that one-fourth of each check represented reimbursement for such awards. It follows that 56.25 percent of each represented reimbursement for salesmen's commissions, and that 18.75 percent represented petitioner's overrides. Because only the last amount--his override commissions--would be taxable to petitioner, we include in petitioner's income for 1959 18.75 percent of $7,700, or $1,443.75. The two checks from Bill Allen we include at their *371 face amounts. Brimmer also attributed to petitioner $525.90 in payments by Developers and Lakewood, which Brimmer determined were for petitioner's benefit, as follows: Payee
Amount
Mayflower Hotel
$ 95.38
Clothing Corp. of America
62.80
Washington Garage
25.00
Diners Club
45.21
Washington Garage
16.80
Gaslight Club
109.95
Gaslight Club
55.98
Harry Gresner, Pro
114.78
$525.90
Brimmer's rationale for attributing these receipts to petitioner strikes us, as indicated supra, as somewhat arbitrary. In most cases, Brimmer's determination was based on the fact that petitioner had signed the billing slip at the establishment in question. Petitioner and Allen testified that petitioner was heavily involved in promoting the club and that the corporation's policy was not to pay the personal expenses of its employees. Normally, the respondent's determination might carry heavier weight, but considering the circumstances under which the determination was made, and the difficulty in rebutting it created by respondent's inexplicable delay in bringing this case and failure to produce adequate documentary evidence, we find that 95 percent of the payments in *372 question were not made for petitioner's benefit, leaving 5 percent, or $26.30 to be included in petitioner's income for 1959. Respondent also attributed as income to petitioner in 1959 one-third of a $25,000 payment from Post's client account to Funkhouser Industries, Inc., for the transfer to Associates of waterfront property on Maryland's eastern shore. Previously, Post had made an unauthorized deposit in his client account of $100,000 withdrawn from Lakewood. Respondent determined that the payment to Funkhouser was to be characterized as a withdrawal from Lakewood for the personal benefit of Pickett, Allen, and Post. To his income tax return for 1962, petitioner attached a handwritten statement reporting as income for that year approximately the sum in question here. The statement's description of the circumstances surrounding the receipt are somewhat vague and not entirely consistent with other evidence in the record. We conclude that it is in essence, however, an acknowledgment by petitioner that he did receive as income from Lakewood the amount at issue, so that the only remaining question is whether the item is to be included in petitioner's income in 1959, as respondent *373 determined, or in 1962 as petitioner reported. We find that respondent's determination has not been overcome, and we, therefore, include $8,333.33 in petitioner's income for 1959. We hold that petitioner's gross income for 1959 was thus as follows: Reported on return
$ 9,213.23
Withdrawal from Lakewood
8,333.33
Commissions from Developers
1,443.75
Commissions from Bill Allen
430.00
Expenses for Pickett's
benefit
26.30
$19,446.61
On his return for 1959, petitioner claimed itemized business deductions of $804.47, as detailed in our findings of fact. Respondent disallowed those expenses in full. For reasons similar to those above, we find that the expenses are to be allowed to the extent of 95 percent, or $764.25. 1960
For 1960, respondent determined petitioner's unreported income to be $20,764.62, as follows: Commission income Lakewood
$ 1,941.76
Management and advisory fees,
Developers
6,515.98
Personal expense payments by
Lakewood or Developers
4,508.41
Other income, Troy V. Post,
Jr. account
7,798.47
$20,764.62
Again, we infer that the checks from Lakewood and Developers totaling $8,457.74 which were not reported *374 on petitioner's returns were largely reimbursement for petitioner to and for the benefit of his salesmen and conclude that 18.75 percent of those checks, or $1,585.83, is includable in petitioner's gross income for 1960. We also conclude that 95 percent of the corporations' alleged payments of petitioner's personal expenses are not to be so characterized, so that 5 percent, or $225.42, is to be included in petitioner's gross income for 1960. We find, too, that none of the payments from Post's client account, determined by respondent to total $7,798.47, are to be attributed to petitioner as income. Petitioner testified that in 1960 he received $2,000 from the Post account as a loan which he subsequently repaid and that he received no other sums. The record contains no documentation of any disbursements from the account, beyond a bare entry without dates, check numbers, or amounts, or other particulars, in Brimmer's worksheets. We find that 95 percent ($2,505.45) of the $2,637.32 in itemized business deductions claimed by petitioner for 1960, as set out in our findings of fact, is to be allowed. Respondent disallowed a capital loss deduction of $800. Petitioner has made no showing *375 whatsoever to rebut respondent's determination, and we, therefore, let it stand. Petitioner reported income of $16,740.82 on his Federal income tax return for 1960. We find that petitioner's adjusted gross income for 1960 was $16,046.62, computed as follows: Unreported income
$ 1,811.25
Reported income
16,740.82
Total gross income
18,552.07
Less business deductions
-2,505.45
Adjusted gross income
$16,046.62
Although respondent has abandoned his argument that petitioner is liable for the addition to tax for fraud under section 6653(b), in his answer, he claimed, in the alternative to the addition for fraud, additions to tax for negligence and delinquent filing under sections 6653(a) and 6651(a), respectively, for the years 1960 and 1961. Respondent's claim for the above additions was proper under section 6214(a).[5] However, under Rule 142(a) of the Rules of Practice and Procedure of this Court, [6] the burden of proof with respect to the additions falls on respondent. To sustain the additions for delinquency, respondent must show not only that petitioner's returns *376 for 1960 and 1961 were filed late, but also that such filing was due to "willful neglect" and not to "reasonable cause," within the meaning of section 6651(a). Bruner Woolen Co., Inc.,6 B.T.A. 881, 882 (1927). We find no evidence in the record bearing upon petitioner's reasons for the apparently tardy filing of his returns for the years in question. We hold that respondent, therefore, has not carried his burden of proof, and we find no justification for imposing the addition to tax for delinquency. *377 We also find that the record indicates that petitioner's failure to report certain items of income in 1960 and 1961 (see infra) as well as his apparently late filing of his returns for those years, were as likely due to simple inadvertence or good-faith error as they were due to negligence. We hold that respondent has failed to sustain imposition of the addition to tax for negligence. 1961
For 1961 respondent determined that petitioner received unreported income of $1,234.68 from payment by Developers of his personal expenses. For reasons expressed above, we find that 95 percent of that amount is not to be included in petitioner's income, leaving $61.73 to be included. Respondent determined the remainder of petitioner's income for 1961 by the bank deposits method. In accord with a stipulation by petitioner that petitioner's wife had no receipts other than her own salary in 1961, respondent included in his computations petitioner's wife's bank deposits. Petitioner's deposits for 1961 totaled $8,518.30, and his wife's were $8,641.03, for a sum of $17,159.33. Respondent determined deductions from petitioner's bank deposits as follows: Loan proceeds
$1,650.00
Bank transfers
310.00
Net wages, Dolores
H. Pickett
1,373.65
$3,333.65
*378 We find that petitioner's loan proceeds for 1961 were actually $1,925, as follows: Lender
Amount
William C. Pickett
$1,475
Raymond J. Briscuso
250
Robert A. Bock
200
$1,925
Further, petitioner and several other witnesses testified credibly that petitioner gambled heavily at horse racetracks in the Washington area during the years at bar and that his practice in connection therewith was to write numerous small checks and try to intercept them with deposits of gambling proceeds and small loans from friends and acquaintances before they cleared the bank's accounting systems. We again have no basis in the record for precise determination, but as a rule of thumb we assume that 75 percent of the deposits of $75 or less did not represent actual income, but were circulated ("kited") funds or loans. Petitioner's total deposits of $75 or less during 1961 were $1,354.30; petitioner's wife's were $483.03, for a total of $1,837.33, 75 percent of which is $1,378. We conclude that petitioner's gross income for 1961 was $12,234.41: Personal expenses paid
$ 61.73
Total bank deposits
17,159.33
Less: Loan proceeds
-1,925.00
Bank transfers
-310.00
Net wages, Dolores H. Pickett
-1,373.65
"Circulated" funds
-1,378.00
12,234.41
*379 Respondent disallowed business deductions claimed by petitioner of $4,345.27. As we did for 1959 and 1960, we find that 95 percent of the claimed expenses, or $4,128.01, is deductible. Petitioner's adjusted gross income for 1961 was thus $7,930.49, computed as follows: Gross income
$12,276.87
Less business deduc-
tions
-4,345.27
Adjusted gross income
$ 7,931.60
As noted above, in his answer, respondent claimed additions to petitioner's tax for 1961 for negligence, under section 6653(a), and for delinquency, under section 6651(a). We reiterate that respondent has not carried his burden of proof as to these additions and we hold that they are not to be imposed. 1962
Respondent's determination of petitioner's income for 1962 was solely by the bank deposits method. Petitioner's deposits were $6,647.50; his wife's were $7,561.10. Deductions allowed by respondent from petitioner's bank deposits were as follows: Loan proceeds
$4,946.31
Bank transfers
485.00
$5,431.31
We find that petitioner's loan proceeds for 1962 were in fact $5,221.31, as follows: Lender
Amount
William C. Pickett
$ 275.00
Warren M. Lockwood
750.00
Patrick Gregg
100.00
William R. Teunis
500.00
James C. Martin
900.00
Bank of Bethesda
2,696.31
$5,221.31
*380 As for 1961, we also subtract from petitioner's deposits 75 percent of the deposits of $75 or less, to compensate for amounts essentially "kited" through banks by petitioner in the course of his gambling activities. Petitioner's total deposits of $75 or less during 1962 were $572.50; his wife's were $657.50, for a total of $1,230, 75 percent of which is $922.50. We conclude that petitioner's gross income for 1962 was $7,579.79. Total bank deposits
$14,208.60
Less: Loan proceeds
-5,221.31
Bank transfers
-485.00
"Circulated" funds
-922.50
Gross income
$ 7,579.79
Respondent disallowed business deductions of $2,919.44 for 1962. As for prior years, we allow 95 percent, or $2,773.47 of those deductions. We find that petitioner's adjusted gross income for 1962 was thus $4,805.94. Gross income
$7,579.79
Less business deductions
-2,773.47
$4,806.32
Decision will be entered under Rule 155.
Footnotes
1. This is 50 percent of the total tax determined to be due for 1960 because petitioner's 1960 return was not timely filed. See sec. 6653(c)(1), I.R.C. 1954↩, for definition of "underpayment" upon which the fraud penalty is computed.
2. We are not entirely persuaded that respondent conducted an adequate search for the original records in question. Petitioner and his fellow promoters of the country club project were indicted and tried on a charge of mail fraud presumably in connection with this project. Counsel for respondent in this case requested the Justice Department to try to locate these records in the Federal Records Center. Apparently four or five boxes of records were located, and the checks in the record at present were sent to respondent with the comment that they were the only records in the boxes that pertained to the present case.↩
3. This figure should be $898.27. The mistake in addition occurred on petitioner's return.↩
4. All sections references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
5. SEC. 6214. DETERMINATIONS BY TAX COURT. (a) Jurisdiction as to Increase of Deficiency, Additional Amounts, or Additions to the Tax.--The Tax Court shall have jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, notice of which has been mailed to the taxpayer, and to determine whether any additional amount, or addition to the tax should be assessed, if claim therefor is asserted by the Secretary or his delegate at or before the hearing or a rehearing. ↩
6. RULE 142. BURDEN OF PROOF (a) General: The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court; and except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in this answer, it shall be upon the respondent. As to affirmative defenses, see Rule 39↩.