# United States Tax Court

T.C. Memo. 2023-73

MURFAM ENTERPRISES LLC,
WENDELL MURPHY, JR., TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 8039-16.                              Filed June 15, 2023.

————

M, a TEFRA partnership, owned a rural, undeveloped tract of land ("Tract") that had been granted certificates by State authorizing hog-farming activities. Rather than using these certificates to construct and operate a hog farm, M donated by deed in 2010 a perpetual conservation easement (constituting a "qualified real property interest" under I.R.C. § 170(h)(1)(A)) on Tract to T (a "qualified organization" under I.R.C. § 170(h)(1)(B)) for "conservation purposes" under I.R.C. § 170(h)(1)(C). Relying on an appraisal, M claimed a charitable contribution deduction of $5,744,600 for a "qualified conservation contribution" under I.R.C. § 170(h) on its tax return, prepared by competent professionals who were given all the information they requested. M's expert valued its deduction on the basis of the forgone value of the hog-farming certificates attached to the Tract that were rendered useless under the easement deed. Attached to the return was an incomplete Form 8283, "Noncash Charitable Contributions", that did not report M's basis in the Tract and other information.

R examined M's return and issued a Notice of Final Partnership Administrative Adjustment ("FPAA") determining to reduce the deduction (but not to disallow it

[*2] altogether). The FPAA asserted that the easement should be valued according to the Tract's use as timberland, because it determined that the value of the hog-farming certificates was zero. The FPAA did not assert any penalties. M filed a petition in this Court challenging the FPAA.

In his amended answer, R asserted (for the first time, i.e., as "new matter") accuracy-related penalties under I.R.C. § 6662. Before trial, R also asserted (again, as "new matter") that M's charitable contribution deduction should be entirely disallowed for failure to comply with the substantiation and reporting requirements for charitable contribution deductions under I.R.C. § 170(f)(11). R agrees he has the burden of proof as to "new matter".

The issues for decision are (1) whether M failed to comply with the substantiation and reporting requirements of I.R.C. § 170(f)(11), and if so, whether that failure is excusable for reasonable cause under I.R.C. § 170(f)(11)(A)(ii)(II); (2) the value of the easement granted on the Tract; and (3) whether any penalty under I.R.C. § 6662 is applicable.

*Held*: M failed to comply (strictly or substantially) with the substantiation and reporting requirements of I.R.C. § 170(f)(11), but that failure was due to reasonable cause because R failed to carry his burden to disprove reasonable cause.

*Held, further*, the value of the easement granted on the Tract is $5,637,207 (about $107,000 less than M claimed)—which constitutes the forgone value of the hog-farming certificates.

*Held, further*, to the extent applicable, any accuracy-related penalty under I.R.C. § 6662 is excused by reasonable cause under I.R.C. § 6664(c).

————

[*3] *David D. Aughtry*, *John W. Hackney*, and *Kristen S. Lowther*, for petitioners.

*Amy Dyar Seals*, *Olivia Hyatt Rembach*, *Corey R. Clapper*, and *Ashley M. Bender*, for respondent.

TABLE OF CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION ..................... 4

FINDINGS OF FACT ................................................................. 6

    The Murphy family ............................................................. 6

    Murfam and the Rose Tract ............................................... 6

    Murfam's Rose Tract easement donation ......................... 7

    Valuing the Rose Tract easement ..................................... 8

    Reporting the easement donation on Murfam's 2010 return ......... 8

    Examination, FPAA, and Tax Court proceedings ........................... 9

        IRS examination and FPAA ....................................... 9

        Petition and answer ................................................... 10

        Trial of this case ....................................................... 10

    The value of the Rose Tract easement ........................... 10

OPINION .................................................................................. 11

I.    Burden of proof ................................................................. 11

    A.    The general rule ...................................................... 11

    B.    The "new matter" exception ..................................... 11

        1.    The nature of "new matter" ........................... 12

        2.    The "reasonable cause" defense as to "new matter" penalty ......... 12

[*4]     3.   The "reasonable cause" defense as to a "new matter" substantiation issue under section 170(f)(11)(A)(i) ........ 13

II. Charitable contribution deduction under section 170 for donation of a conservation easement ............................................. 15

    A.   Whether Murfam made a "qualified conservation contribution" under section 170(h)(1) .................................... 15

    B.   Whether Murfam satisfied the substantiation requirements of section 170(f)(11) and Treasury Regulation § 1.170A-13(c) ........................................ 16

       1.   A description of the requirements ................................. 16

       2.   Murfam's noncompliance and reasonable cause ............ 17

    C.   The value of Murfam's easement donation ........................... 24

       1.   The method of valuing the conservation easement ........ 24

       2.   The valuation of the Rose Tract easement ..................... 26

III. Penalties under section 6662 ......................................... 31

    A.   Penalty principles ................................................. 31

    B.   Section 6662 penalties with respect to Murfam .................... 32

       1.   Valuation misstatement penalty .................................. 32

       2.   Other accuracy-related penalty ..................................... 32

IV. Conclusion ............................................................ 34

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, *Judge*: At issue is a charitable contribution deduction for the donation in 2010 of a conservation easement by a TEFRA partnership,[1] Murfam Enterprises, LLC ("Murfam"), to the

---

[1] Before its repeal, *see* Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 1101(a), 129 Stat. 584, 625, the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub. L. No. 97-248, §§ 401–406, 96 Stat. 324, 648–71, governed the tax

**[\*5]** North American Land Trust ("NALT"). Pursuant to section 6223(a)(2),[2] the IRS issued to Murfam an FPAA determining to reduce from $5,744,600 to $446,000 the amount of the deduction claimed on Murfam's Form 1065, "U.S. Return of Partnership Income", for the tax year ending on January 1, 2011.[3] Wendell ("Dell") Murphy, Jr., as tax matters partner ("TMP") of Murfam and thus as petitioner in this case, timely filed a Petition for Readjustment of Partnership Items in this Court challenging the determination.

After concessions, the remaining issues for decision are: (1) whether Murfam's tax return satisfied the substantiation and reporting requirements of section 170(f)(11) for claiming the deduction; (2) the fair market value of the easement; and (3) whether any accuracy-related penalties under section 6662 are applicable. We hold (1) that Murfam did not satisfy the reporting requirements of section 170(f)(11), but that its failure to do so was for reasonable cause; (2) that the value of the easement donated by Murfam was $5,637,207 (i.e., about $107,000 less than Murfam claimed on its return); and (3) that reasonable cause exists under section 6664(c)(1) to excuse any section 6662 penalty.

---

treatment and audit procedures for many partnerships—including Murfam. TEFRA partnerships are subject to special tax and audit rules. *See* I.R.C. §§ 6221–6234. TEFRA requires the uniform treatment of all "partnership item[s]"—a term defined by section 6231(a)(3)—and its general goal is to have a single point of adjustment for the Internal Revenue Service ("IRS") rather than having it make separate partnership-item adjustments on each partner's individual return. *See* H.R. Rep. No. 97-760, at 599–601 (1982) (Conf. Rep.), *as reprinted in* 1982-2 C.B. 600, 662–63. If the IRS decides to adjust any partnership items on a partnership return, it must notify the individual partners of the adjustment by issuing a Notice of Final Partnership Administrative Adjustment ("FPAA"). § 6223(a).

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., as in effect at the relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), as in effect at the relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts are rounded. A citation of a "Doc." in this Opinion refers to a document as numbered in the Tax Court docket record of this case, and a pinpoint citation therein refers to the pagination as generated in the digital file.

[3] Murfam reports its taxes according to a fiscal year ending on a Saturday, which results in some years having more than 365 days and other years having fewer than 365 days.

**[\*6]**                              FINDINGS OF FACT

When its petition was filed, Murfam's principal place of business was in North Carolina.[4]

*The Murphy family*

The Murphy family is a multi-generation farming family from Bladen County, North Carolina, which has operations throughout the country. The Murphy family is well known for its success and innovation in the hog-farming industry, and Wendell Murphy, Sr. (the patriarch of the family), helped develop various processes that became industry-standard practices in hog farming. One such process is known as ISO wean, or three-site production, in which farmers use separate facilities during the various stages of hog farming (birth, growth, and slaughter) to separate the animals and reduce the transmittal of bacteria and potential diseases which affect swine differently depending on their ages and immune systems. Wendell Murphy also taught agriculture classes to high school students and was active in various environmental projects and policy proposals submitted to the North Carolina state legislature. Wendell remained actively involved in the Murphys' business until sometime around 2010, when he retired to Florida. By that time his son, Dell Murphy, was managing the Murphys' business, which included 50 hog-farming facilities as well as various real estate projects and investments in North Carolina.

*Murfam and the Rose Tract*

The Murphy family formed Murfam in December 1999, and in January 2000 Murfam obtained ownership of the "Rose Tract"—6,171 acres of undeveloped, rural land in Bladen County, North Carolina, which is mostly covered with trees and has a few dirt roads. The State of North Carolina granted certificates permitting 1,115 acres (i.e., about 18% of the area) of the Rose Tract to be used for hog farming. These hog-farming certificates covered eight specific sites (i.e., fixed locations) on the Rose Tract and regulated the extent of allowable hog farming (to limit the volume of waste on the property), which it stated in terms of the number of hogs to be permitted for a given stage of production. The hog-farming certificates were "attached" to the Rose Tract, meaning that the hog-farming rights they authorized passed to future grantees of the

---

[4] Under section 7482(b)(1), venue for an appeal in this case would be the U.S. Court of Appeals for the Fourth Circuit.

**[\*7]** Rose Tract and could not be exercised on any other property. The hog-farming certificates that were attached to the Rose Tract authorized a 58,752-swine "feeder-to-finish" facility, but (important to the valuation of the Rose Tract) could have been converted to a "farrow-to-wean" facility.[5] If the hog-farming certificates had been converted to a "farrow-to-wean" operation, the total number of sows permissible would have been 19,538.

After 2007 (i.e., at the time of the donation at issue here), new hog-farming certificates were no longer available to properties in North Carolina, because of a state-imposed moratorium under which no new certificates would be issued but existing certificates remained valid, thus making the Rose Tract valuable for its possible use as a hog farm. However, to use the hog-farming certificates, the owner would need to prepare the Rose Tract by clearing trees, constructing various facilities, and digging a lagoon for waste treatment. Although the Murphy family could have taken the steps to construct and operate a hog farm on the Rose Tract, they left it undeveloped and used it for recreational purposes such as hunting.

*Murfam's Rose Tract easement donation*

In 2010 the Murphy family donated five conservation easements—one of which is the subject of this Opinion[6]—to NALT, a section 501(c)(3) charitable organization that is a "qualified organization" for the purposes of section 170(h)(1)(B). The Murphys donated the easement at issue (located on the Rose Tract) through Murfam.

On December 27, 2010, ten years after it had first acquired the Rose Tract, Murfam granted to NALT a deed of easement titled "Conservation Easement and Declaration of Restrictions and

---

[5] The various stages of hog farming include "farrow-to-wean" (the stage from the sow's giving birth to a litter of piglets until that litter is weaned after six to eight weeks) and "feeder-to-finish" (the stage during which a weaned pig grows to finished weight).

[6] The Commissioner initially challenged the deductibility of all five of the conservation easements donated by the Murphy family, but he has since conceded that the Murphys are entitled to charitable contribution deductions for two of them (referred to by the parties as "Magnolia #3" and "Magnolia #4"). Two other conservation easement donations are at issue in related cases (Docket Nos. 14536-16 and 14541-16) that were previously consolidated with the instant case for trial but now are severed, to be addressed in a separate opinion.

[*8] Covenants" covering 1,115 acres of the Rose Tract. (We refer to this deed as the "Rose Tract easement deed" and to the resulting easement as the "Rose Tract easement".) The Rose Tract easement covers the same portions of the Rose Tract as the hog-farming certificates. The Rose Tract easement deed was recorded with the State of North Carolina, County of Duplin, on December 30, 2010. The Rose Tract easement deed specifically prohibits any agricultural activities on the Rose Tract pursuant to the hog-farming certificates. The deed required the Murphy family to "proceed immediately to extinguish" the certificates, and further provided that the certificates could not be "transferred to any real property owned by Owner or other real property in Bladen County." The donation of the Rose Tract easement therefore prevented the Murphy family (or its transferees) from ever using the Rose Tract as a hog farm, thereby rendering the hog-farming certificates useless.

*Valuing the Rose Tract easement*

Before making the conveyance, Murfam engaged Andrew Piner, of Moore & Piner, LLC, to appraise the Rose Tract easement, and Mr. Piner's appraisal considered the value of the forgone rights under the hog-farming certificates. As of Murfam's contribution on December 27, 2010, the hog-farming certificates had not been (though they could have been) converted from "feeder-to-finish" to "farrow-to-wean". Furthermore, the Murphy family had not constructed any hog farm facilities on the Rose Tract, although the hog-farming certificates had permitted the construction of such facilities on the Rose Tract without an additional building permit.

Mr. Piner appraised the Rose Tract as of December 27, 2010, using a "before and after" valuation method. He determined that the highest and best use of the Rose Tract before the easement donation would have been to convert the hog-farming certificates to a farrow-to-wean facility, to construct the necessary facilities, and to grow timber on the remaining acreage. On these assumptions, Mr. Piner ultimately determined the value of the Rose Tract before donation of the easement to be $10.5 million, computed the after value to be $4.8 million, and reasoned that the easement therefore had a value of $5.7 million.

*Reporting the easement donation on Murfam's 2010 return*

The Murphy family engaged Dixon Hughes Goodman ("Dixon Hughes")—one of the largest certified public accountancy ("CPA") firms

[*9] in North Carolina—to prepare Murfam's tax return for its tax year ending January 1, 2011. Dixon Hughes requested from the Murphy family all the information it deemed necessary to prepare Murfam's return, and the Murphy family provided to Dixon Hughes all the information that the firm had requested. Dixon Hughes prepared Murfam's Form 1065 on the basis of the information received from the Murphy family, and Murfam's return was filed as it was prepared by Dixon Hughes. Murfam's return reported the donation of the Rose Tract easement and claimed a corresponding charitable contribution deduction of $5,744,600 (i.e., the value of the Rose Tract easement as appraised by Mr. Piner).

Murfam's return included Form 8283, "Noncash Charitable Contributions". The Form 8283 was signed by the appraiser, Mr. Piner; it included the cover letter of his appraisal; and it was also signed by Andrew L. Johnson, the president of NALT, the donee organization. However, certain portions of the Form 8283 were either missing or incomplete: Page 1 was not included. On Page 2, Part 1 of Section B did not report the date or the manner in which the donor acquired the property, the donor's cost or adjusted basis in the property, or whether the contribution was made as part of a bargain sale.

*Examination, FPAA, and Tax Court proceedings*

*IRS examination and FPAA*

The IRS examined Murfam's 2010 return, and on December 21, 2015, the IRS issued to Dell Murphy, as Murfam's TMP, an FPAA determining to reduce Murfam's charitable contributions by $5,298,600. The FPAA included Form 886–A, "Explanation of Adjustments", which stated:

> It has not been established that the value of the noncash charitable contribution of a Qualified Conservation Easement deducted on your return was $5,744,600. It is determined that the value of the charitable contribution attributable to the Qualified Conservation Easement is $446,000; therefore, the charitable contribution is decreased by $5,298,600 for the taxable year ended January 01, 2011.

The FPAA issued to Murfam did not assert liability for any penalty, nor did it determine to deny the charitable contribution deduction on the basis of Murfam's failure to fully complete Form 8283 (and thereby to

**[\*10]** satisfy the substantiation and reporting requirements of section 170(f)(11)).

*Petition and answer*

Dell Murphy, as TMP, timely filed in the Tax Court a petition to challenge the adjustment in the FPAA. In his answer, the Commissioner asserted—for the first time—a gross valuation misstatement penalty under section 6662(e) or (h) or, in the alternative, an accuracy-related penalty under section 6662(a). Like the FPAA, the Commissioner's answer did not allege noncompliance with the requirements of section 170(f)(11) to report in the return and attach to the return certain information with respect to the taxpayer's basis in the donated property and the appraisal thereof. Rather, the Commissioner first made this contention in his pretrial memorandum.

*Trial of this case*

This case was consolidated for trial with cases at Docket Nos. 14536-16 and 14541-16 (pertaining to two other conservation easements donated by the Murphy family through an S corporation in 2010), during which the parties offered expert reports and testimony regarding the values of the Rose Tract easement. Additionally, the Murphy family testified regarding their businesses and the preparation of the tax returns in these cases.

*The value of the Rose Tract easement*

The parties agree, in principle, that the value of the Rose Tract easement is in effect the value of the hog-farming certificates. Murfam forfeited that value when it made the donation of the easement; but the parties disagree about what that value is. In preparation for trial, Murfam again engaged Mr. Piner to value the Rose Tract easement, and the Commissioner engaged Matthew Hawk to value it. After due consideration of the expert reports and testimony offered by both parties, and for the reasons explained below in Part II.C.2, we find that the highest and best use of the Rose Tract before the easement donation was (as Murfam contends) operating a hog farm after converting the hog-farming certificates for use as a farrow-to-wean facility (with timber growing on the remaining acreage), and that the corresponding value of the Rose Tract before the easement donation was $11,438,207. We find that the highest and best use of the Rose Tract after the easement

**[*11]** donation was to grow timber,[7] and the parties agree that the value of the Rose Tract after the easement donation was \$5,801,000. Therefore, we find that the fair market value of the Rose Tract easement was \$11,438,207 minus \$5,801,000, or \$5,637,207.

## OPINION

I.  *Burden of proof*

A.  *The general rule*

Rule 142(a) provides that "[t]he burden of proof[8] shall be upon the petitioner, except as otherwise provided by statute or determined by the Court". Generally, the IRS's adjustments in an FPAA are presumed to be correct, and the taxpayer bears the burden of proving them wrong. *See Welch v. Helvering*, 290 U.S. 111, 115 (1933). Petitioner thus generally bears the burden of proving Murfam's entitlement to the charitable deduction for qualified conservation contributions under the applicable provisions of section 170. However, in this case the Commissioner concedes that "[t]he Rose Tract conservation easement contribution satisfies the requirements of Internal Revenue Code section 170(h)(1)(C)" and that "[t]here is no issue in concern to the conservation purpose of the Rose Tract donation by Murfam Enterprises, LLC." Consequently, petitioner bears only the remaining burden of proving the value of the Rose Tract conservation easement.

B.  *The "new matter" exception*

The general rule that the taxpayer bears the burden of proof is subject to an exception that affects the outcome of some issues in this case: Not the taxpayer but the Commissioner bears the burden of proof

---

[7] The value of timber on the Rose Tract before easement donation was the same as the timber value after the easement donation, therefore not affecting the valuation of the Rose Tract easement.

[8] As to burden of *production*, section 7491(c) provides that the Commissioner "shall have the burden of production in any court proceeding with respect to the liability of any *individual* for any penalty, addition to tax, or additional amount". (Emphasis added.) However, section 7491(c) does not apply to TEFRA partnership-level proceedings (such as this case). *See Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 234 (2018). Consequently, as a general rule, in a TEFRA partnership case the petitioner has not only the burden proof but also the burden of production, even as to any penalty.

**[\*12]** "in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer". Rule 142(a).

### 1. *The nature of "new matter"*

"A new theory that is presented to sustain a deficiency is treated as a new matter when it either [1] alters the original deficiency or [2] requires the presentation of different evidence. A new theory which merely clarifies or develops the original determination is not a new matter in respect of which respondent bears the burden of proof." *Wayne Bolt & Nut Co. v. Commissioner*, 93 T.C. 500, 507 (1989) (citations omitted).

### 2. *The "reasonable cause" defense as to "new matter" penalty*

Under section 6664(c)(1), "No penalty shall be imposed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a *reasonable cause*[9] for such portion and that the taxpayer acted in good faith with respect to such portion." (Emphasis added.) Where the Commissioner asserts a penalty for the first time as "new matter" in his answer and reasonable cause is at issue, the Commissioner's burden of proof on the imposition of that penalty includes showing the *absence* of "reasonable cause". *See, e.g.*, *RERI Holdings I, LLC v. Commissioner*, 149 T.C. 1, 38–40 (2017), *aff'd sub nom. Blau v. Commissioner*, 924 F.3d 1261 (D.C. Cir. 2019); *Rader v. Commissioner*, 143 T.C. 376, 389 (2014), *aff'd in part, appeal dismissed in part*, 616 F. App'x 391 (10th Cir. 2015); *Arnold v. Commissioner*, T.C. Memo. 2003-259, 86 T.C.M. (CCH) 341, 344; *Collins v. Commissioner*, T.C. Memo. 1994-409, 68 T.C.M. (CCH) 484, 488; *Taylor v. Commissioner*, T.C. Memo. 1989-201, 57 T.C.M. (CCH) 276, 279–80; *Pickett v. Commissioner*, T.C. Memo. 1975-33, 34 T.C.M. (CCH) 213, 224; *Bruner Woolen Co. v. Commissioner*, 6 B.T.A. 881, 882 (1927).

In this case, the FPAA included no penalty determination. Rather, the Commissioner first asserted penalties in an amended answer to the petition that pleaded liability for gross valuation

---

[9] In addition to the "reasonable cause" exception of section 6664(c), a "reasonable basis" provision built into the very definition of a penalty-incurring "substantial understatement" in section 6662(d)(2)(B)(ii)(II) states that "[t]he amount of the understatement . . . shall be reduced by that portion of the understatement which is attributable to . . . any item if . . . there is a *reasonable basis* for the tax treatment of such item by the taxpayer." (Emphasis added.)

**[\*13]** misstatement penalties under section 6662(e) and (h), or in the alternative, accuracy-related penalties under section 6662(a). Because the penalties asserted by the Commissioner in his amended answer would increase the liability determined in the FPAA issued to Murfam, they are "new matter" for which the Commissioner bears the overall burden of proof. That burden includes the burden to prove the absence of "reasonable cause". *See Rader*, 143 T.C. at 389; *Arnold*, 86 T.C.M. (CCH) at 344; *Bruner Woolen Co.*, 6 B.T.A. at 882.

> 3. *The "reasonable cause" defense as to a "new matter" substantiation issue under section 170(f)(11)(A)(i)*

A second "reasonable cause" provision is also significant in this case. As is explained below in greater detail in Part II.B, the Code has a demanding regime for substantiating charitable contribution deductions like the ones at issue here. Section 170(f)(11) and Treasury Regulation § 1.170A-13(c)(2)(i)(B) require that the taxpayer "[a]ttach a *fully completed* appraisal summary" (emphasis added) to his return, and that appraisal summary is to include "[t]he cost or other basis of the property". *Id*. subpara. (4)(ii)(E). If a donor fails to meet these requirements, then section 170(f)(11)(A)(i) provides that "no deduction shall be allowed".

However, there is an exception to this disallowance. Section 170(f)(11)(A)(ii)(II) provides that the taxpayer's deduction will not be disallowed "if it is shown that the failure to meet such requirements is due to reasonable cause and not to willful neglect"; and "reasonable cause" is, of course, the same phrase we mentioned in Part I.B.2 above in connection with penalties, where we showed that a shift in the burden of proof as to a penalty affects the burden of proof as to a "reasonable cause" defense to that penalty. This Court has not previously addressed explicitly the question of the burden of proof on the "reasonable cause" defense when the Commissioner raises the issue of noncompliance with section 170(f)(11) as "new matter" in litigation and reasonable cause for the noncompliance is at issue. But in *Belair Woods* we considered the relatedness of the section 170(f)(11)(A)(ii)(II) "reasonable cause" defense to the "reasonable cause" defense in the penalty context, and we concluded that the same standard—"ordinary business care and prudence", *United States v. Boyle*, 469 U.S. 241, 246 (1985) (quoting Treas. Reg. § 301.6651-1(c)(1))—should apply in both instances, *see Belair Woods, LLC v. Commissioner*, T.C. Memo. 2018-159, at \*22–23 (first citing *Alli v. Commissioner*, T.C. Memo. 2014-15,

**[\*14]** at \*60–61; and then citing *Crimi v. Commissioner*, T.C. Memo. 2013-51, at \*98–99).

Consistent with that conclusion in *Belair Woods* that penalty principles properly inform our construction of "reasonable cause" under the substantiation provisions of section 170(f)(11)(A)(ii)(II), we hold that the determination of which party bears the burden of proof on reasonable cause under the substantiation provisions depends (as it does for penalty liability) on whether the Commissioner's contention of noncompliance with the substantiation provisions is new matter. If the Commissioner's contention about noncompliance with the substantiation requirements of section 170(f)(11) is new matter, then he bears the burden on that contention and on the "reasonable cause" defense to it—i.e., the Commissioner must prove the absence of reasonable cause.

This shift in the burden of proof occurs here. As we discuss below in Part II.B.2, the Commissioner argues that Murfam's charitable contribution deduction should be entirely disallowed because of Murfam's failure to comply with the substantiation requirements of section 170(f)(11)(C) and Treasury Regulation § 1.170A-13(c)(2) and (4), since Murfam did not attach a "fully completed appraisal summary" on Form 8283 to its tax return; and the Commissioner denies the existence of "reasonable cause" for that noncompliance under section 170(f)(11)(A)(ii)(II). The Commissioner first made this contention not in the FPAA, not in his answer to the petition nor in his amended answer, but rather in his pretrial memorandum. We conclude that compliance with the appraisal summary requirement of section 170(f)(11)(C) and Treasury Regulation § 1.170A-13(c)(2) and (4) was "new matter" at the trial of this case; and we further conclude, guided by our penalty jurisprudence as we construe and apply the section 170(f)(11)(A)(ii)(II) reasonable cause defense, that the Commissioner's burden includes showing that the failure to fully complete the appraisal summary was not due to reasonable cause or was due to willful neglect. *See Belair Woods, LLC*, T.C. Memo. 2018-159, at \*22–23; *Alli*, T.C. Memo. 2014-15, at \*60–61; *Crimi*, T.C. Memo. 2013-51, at \*98–99.

The FPAA issued to Murfam, quoted above at page 9, determined that a deduction under section 170(h) is allowable, but for a significantly lesser amount than what Murfam claimed on its return. The FPAA therefore states the grounds for its determination as valuation, and (as

**[\*15]** stated above) Murfam bears the burden to prove the value of the charitable contribution deduction claimed on its return.

However, the Commissioner's appraisal summary theory, if correct, would deny the charitable contribution deduction entirely, *see* § 170(f)(11)(A)(i), would accordingly increase the deficiency beyond the determination in the FPAA, and would require different evidence (to prove reasonable cause for the noncompliance). For this reason, the Commissioner's appraisal summary theory is new matter for which he bears the overall burden of proof, including showing a lack of reasonable cause for Murfam's noncompliance.

II. *Charitable contribution deduction under section 170 for donation of a conservation easement*

To show its entitlement to the charitable contribution deduction at issue, Murfam must (a) show that it made a qualifying contribution, (b) show that it satisfied (or is excused from) the substantiation requirements for such a contribution, and (c) prove the value of the contribution. We discuss each of these issues in turn.

A. *Whether Murfam made a "qualified conservation contribution" under section 170(h)(1)*

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year. The Code generally restricts a taxpayer's charitable contribution deduction for donations of "an interest in property which consists of less than the taxpayer's entire interest in such property". § 170(f)(3)(A). That is, if someone owns property and donates to charity only a partial interest in that property, he may not claim a charitable contribution deduction for that donation. However, the statute provides an exception—and allows a deduction—for a "qualified conservation contribution". § 170(f)(3)(B)(iii). Section 170(h)(1) defines a "qualified conservation contribution" to be (1) the contribution of a "qualified real property interest," (2) to a "qualified organization," (3) "exclusively for conservation purposes." In this case there is no dispute that the Rose Tract easement contribution meets these three requirements.

**[\*16]** B.   *Whether Murfam satisfied the substantiation requirements of section 170(f)(11) and Treasury Regulation § 1.170A-13(c)*

1.   *A description of the requirements*

"A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary."  § 170(a)(1).  Section 170(f)(11) imposes, for charitable contribution deductions, heightened substantiation requirements on taxpayers depending on the value of the contribution.[10]   Section 170(f)(11)(A)(i) provides that "no deduction shall be allowed . . . for any contribution of property for which a deduction of more than $500 is claimed unless such person meets the requirements of subparagraphs (B) [for deductions greater than $500], (C) [for deductions greater than $5,000], and (D) [for deductions greater than $500,000], as the case may be, with respect to such contribution."  For contributions of $500 or more, a taxpayer must attach "a description of such property and such other information as the Secretary may require".  § 170(f)(11)(B).  For contributions of $5,000 or more, a taxpayer must also obtain "a qualified appraisal of such property" and attach to the return "such information regarding such property and such appraisal as the Secretary may require".  § 170(f)(11)(C).  Accordingly, Treasury Regulation § 1.170A-13(c)(2)(i) provides:

---

[10] In the Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, § 155(a)(1) and (2), 98 Stat. 494, 691—an off-Code statutory provision—Congress directed the Secretary to issue regulations under section 170(a)(1) "which require any individual, closely held corporation, or personal service corporation claiming a deduction under section 170" greater than $5,000 to "obtain a qualified appraisal for the property contributed," "attach an appraisal summary to the return on which such deduction is first claimed for such contribution," and "include on such return such additional information (including the cost basis and acquisition date of the contributed property) as the Secretary may prescribe in such regulations."  In response to DEFRA's directive, the Secretary added paragraph (c) to Treasury Regulation § 1.170A-13.  But in the American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 883(a), 118 Stat. 1418, 1631, Congress added paragraph (11) to subsection (f) of section 170 to "extend[] to all C corporations the present and prior law requirement, applicable to an individual, closely-held corporation, personal service corporation, partnership, or S corporation, that the donor must obtain a qualified appraisal of the property if the amount of the deduction claimed exceeds $5,000."  Staff of J. Comm. On Taxation, 108th Cong., General Explanation of Tax Legislation Enacted in the 108th Congress, at 462 (Comm. Print 2005).  "The Act also provide[d] that if the amount of the contribution of property . . . exceeds $500,000, then the donor (whether an individual, partnership, or corporation) must attach the qualified appraisal to the donor's tax return."  *Id.*

**[\*17]** [A] donor who claims or reports a deduction with respect to a charitable contribution to which this paragraph (c) [entitled "Deductions in excess of $5,000 for certain charitable contributions of property made after December 31, 1984"] applies must comply with the following three requirements:

> (A) Obtain a qualified appraisal (as defined in paragraph (c)(3) of this section) for such property contributed. If the contributed property is a partial interest, the appraisal shall be of the partial interest.
>
> (B) Attach a fully completed appraisal summary (as defined in paragraph (c)(4) of this section) to the tax return (or, in the case of a donor that is a partnership or S corporation, the information return) on which the deduction for the contribution is first claimed (or reported) by the donor.
>
> (C) Maintain records containing the information required by paragraph (b)(2)(ii) of this section.

Under Treasury Regulation § 1.170A-13(c)(4)(ii), the required appraisal summary must include, among other things, the following information: (1) the date the donor acquired the property; (2) the cost or other basis of the property; and (3) the date the donee received the property. Treas. Reg. § 1.170A-13(c)(4)(ii)(D), (E), (G). For contributions of $500,000 or more, a taxpayer must also attach the "qualified appraisal of such property" to the return. § 170(f)(11)(D). However, as is explained above in Part I.B.3, a taxpayer's deduction will not be disallowed for failure to comply with the heightened substantiation requirements of section 170(f)(11) "if it is shown that the failure to meet such requirements is due to reasonable cause and not to willful neglect." § 170(f)(11)(A)(ii)(II).

### 2. *Murfam's noncompliance and reasonable cause*

Because section 170(f)(11)(A)(i) entirely disallows a claimed charitable contribution deduction unless a taxpayer complies with its substantiation rules, we consider first whether Murfam met the substantiation requirements with respect to the easement donation at issue. We conclude that Murfam did not satisfy the substantiation requirements of section 170(f)(11) either strictly or substantially, but that their failure to do so should be excused for reasonable cause

**[\*18]** because the Commissioner failed to prove an absence of reasonable cause.

### a. *Strict compliance*

Although Murfam acknowledges that it did not report its cost basis in the donated easement on the Form 8283 attached to its return, as required by Treasury Regulation § 1.170A-13(c)(4)(ii)(E), it nonetheless insists that it strictly complied with section 170(f)(11)(C) because it provided its cost basis elsewhere (but nonetheless) "on such return" (quoting DEFRA § 155(a)(1)(C)). Specifically, Murfam asserts that the IRS could have deduced its cost basis in the donated easements either by looking on Schedule L, "Balance Sheet per Books", at line 12, "Land (net of any amortization)", and subtracting the beginning of year amount from the end of year amount, or alternatively by looking at statement 11 from Schedule M–1, "Reconciliation of Income (Loss) per Books With Income (Loss) per Return", and subtracting its reported values from the claimed charitable contribution amounts on Form 8283.

We rejected a similar argument in *Belair Woods, LLC*, T.C. Memo. 2018-159, at \*19–20 (citations omitted), in which we held:

> The regulations require that "an appraisal summary shall include" information concerning basis. The explicit disclosure of basis on Form 8283 is essential in alerting the Commissioner as to whether (and to what extent) further investigation is needed.
>
> The IRS reviews millions of returns each year for audit potential, and the disclosure of cost basis on the Form 8283 itself is necessary to make this process manageable. Revenue agents cannot be required to sift through dozens or hundreds of pages of complex returns looking for clues about what the taxpayer's cost basis might be.

Because section 170(f)(11)(C) and Treasury Regulation § 1.170A-13(c)(4)(i)(A) and (ii)(E) require that a donor's cost basis be reported on Form 8283, and Murfam's Form 8283 left the donor's basis box blank, Murfam did not strictly comply with the reporting requirements of section 170(f)(11).

[*19]                              b.     *Substantial compliance*

Thirty years ago we held in *Bond v. Commissioner*, 100 T.C. 32, 41–42 (1993), that some of the reporting requirements of Treasury Regulation § 1.170A-13(c) are "directory and not mandatory", so that a donor's failure to comply strictly with those requirements may be excused if the donor nonetheless demonstrates "substantial compliance". To determine whether a taxpayer has substantially complied with the reporting requirements of Treasury Regulation § 1.170A-13(c), we "consider whether [the taxpayers] provided sufficient information to permit [the IRS] to evaluate their reported contributions, as intended by Congress." *Smith v. Commissioner*, T.C. Memo. 2007-368, 94 T.C.M. (CCH) 574, 586 (first citing *Bond*, 100 T.C. 32; and then citing *Hewitt v. Commissioner*, 109 T.C. 258 (1997), *aff'd per curiam without published opinion*, 166 F.3d 332 (4th Cir. 1998)), *aff'd*, 364 F. App'x 317 (9th Cir. 2009).

However, we observed in *RERI Holdings I*, 149 T.C. at 16–17:

[B]ecause RERI's omission of its basis . . . from the Form 8283 it attached to its 2003 return prevented the appraisal summary from achieving its intended purpose, RERI's failure to meet the requirement of section 1.170A-13(c)(4)(ii)(E), Income Tax Regs., cannot be excused by substantial compliance. As explained above, Congress directed the Secretary to adopt stricter substantiation requirements for charitable contributions to alert the Commissioner, in advance of audit, of potential overvaluations of contributed property and thereby deter taxpayers from claiming excessive deductions in the hope that they would not be audited. S. Rpt. No. 98-169 (Vol. 1), *supra* at 444; 1984 Blue Book, *supra* at 503–504; *see also Hewitt v. Commissioner*, 109 T.C. at 264. . . . Because RERI failed to provide sufficient information on its Form 8283 to permit respondent to evaluate its reported contribution, *cf. Smith v. Commissioner*, 2007 WL 4410771, at *19, we cannot excuse on substantial compliance grounds RERI's omission from that form of its basis . . . . Therefore, RERI did not "[a]ttach a fully completed appraisal summary" to its 2003 return as required by section 1.170A-13(c)(2)(i)(B), Income Tax Regs. Because RERI did not meet the substantiation requirements provided in section 1.170A-13(c)(2), Income Tax Regs., it is

**[\*20]** not entitled to any deduction under section 170 . . . . *See* sec. 170(a)(1); sec. 1.170A-13(c)(1), Income Tax Regs.

To the same effect, we followed *RERI Holdings I* in *Belair Woods, LLC*, T.C. Memo. 2018-159, at \*17, and determined:

> The requirement to disclose "cost or adjusted basis," when that information is reasonably obtainable, is necessary to facilitate the Commissioner's efficient identification of overvalued property. . . . Unless the taxpayer complies with the regulatory requirement that he disclose his cost basis and the date and manner of acquiring the property, the Commissioner will be deprived of an essential tool that Congress intended him to have.

Therefore, under the reasoning set forth in *Belair Woods, LLC*, T.C. Memo. 2018-159, at \*17–19, and *RERI Holdings I*, 149 T.C. at 16–17, there can be no substantial compliance with Treasury Regulation § 1.170A-13(c) where—as here—the taxpayer fails to disclose its cost or adjusted basis in the contributed property on Form 8283. Because Murfam's Form 8283 did not report its cost basis in the contributed property, it failed to substantially comply with the reporting requirements of Treasury Regulation § 1.170A-13(c), and its charitable contribution deduction must be disallowed unless its failure was "due to reasonable cause and not to willful neglect." *See* § 170(f)(11)(A)(ii)(II).

#### c.    *Reasonable cause for noncompliance*

Section 170(f)(11)(A)(ii)(II) provides that the taxpayer's deduction will not be disallowed "if it is shown that the failure to meet such requirements is due to reasonable cause and not to willful neglect."[11] As

---

[11] As we explained in *Belair Woods, LLC*, T.C. Memo. 2018-159, at \*22–23, the statutory reasonable cause defense under section 170(f)(11)(A)(ii)(II) is broader than the regulatory reasonable cause defense under Treasury Regulation § 1.170A-13(c)(4)(iv)(C)(*1*), which provides:

> If a taxpayer has reasonable cause for being unable to provide the information required by paragraph (c)(4)(ii)(D) and (E) of this section (relating to the manner of acquisition and basis of the contributed property), an appropriate explanation should be attached to the appraisal summary. The taxpayer's deduction will not be disallowed simply because of the inability (for reasonable cause) to provide these items of information.

**[\*21]** is noted above, we concluded in *Belair Woods, LLC*, T.C. Memo. 2018-159, at \*22–23, that the same standard—"ordinary business care and prudence", *Boyle*, 469 U.S. at 246 (quoting Treas. Reg. § 301.6651-1(c)(1))—should apply to both the reasonable cause defense in the penalty context, *see* § 6664(c)(1); Treas. Reg. § 1.6664-4, and the reasonable cause defense of section 170(f)(11)(A)(ii)(II). On the basis of our allocation of the burden of proof above in Part I.B.3, the Commissioner must show that Murfam's failure to report cost basis in the donated properties on its Forms 8283 was not due to reasonable cause.

A frequent ground for claiming "reasonable cause"—and the ground under consideration here—is reliance on professional advice. "Reliance on . . . professional advice . . . constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Treas. Reg. § 1.6664-4(b)(1). Instructed by Treasury Regulation § 1.6664-4(c), we have held that reasonable cause is based on reliance on an advisor where (1) the advisor was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the advisor, and (3) the taxpayer actually relied in good faith on the advisor's judgment. *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002). We now follow this penalty-context analysis in determining reasonable cause under section 170(f)(11)(A)(ii)(II); and we look to see whether the Commissioner—given his burden of proof on this new matter, *see supra* Part I.B.3—has shown that Murfam's omission of basis from Form 8283 is not excused by its reliance on its advisors.

The straightforward and unchallenged trial testimony of Rebecca Welker (the Dixon Hughes CPA who prepared Murfam's Form 1065) established that Dixon Hughes was a well-known firm with a good reputation in North Carolina, that Murfam retained Dixon Hughes to prepare all of its returns during a three-year period and relied on it to do so, that Dixon Hughes requested all the information it thought necessary for preparing Murfam's returns, that Dixon Hughes received all the information that it had requested from Murfam, that Dixon

---

Murfam did not attach to its appraisal summaries any explanations for its failure to report cost basis nor does it assert reasonable cause under Treasury Regulation § 1.170A-13(c)(4)(iv)(C)(*1*). Accordingly, we do not address reasonable cause under Treasury Regulation § 1.170A-13(c)(4)(iv)(C)(*1*) in this Opinion, and instead we consider only the statutory "reasonable cause" defense under section 170(f)(11)(A)(ii)(II).

**[\*22]** Hughes prepared the returns in accordance with that information, and that Murfam filed the returns as they had been prepared by Dixon Hughes.

That testimony seems to check all the boxes prescribed in *Neonatology Associates.* However, Treasury Regulation § 1.6664-4(b)(1) provides that "[r]eliance on . . . the advice of a professional tax advisor or an appraiser does not necessarily demonstrate reasonable cause and good faith." Paragraph (c)(1) further explains:

> In no event will a taxpayer be considered to have reasonably relied in good faith on advice (including an opinion) unless the requirements of this paragraph (c)(1) are satisfied. The fact that these requirements are satisfied, however, will not necessarily establish that the taxpayer reasonably relied on the advice (including the opinion of a tax advisor) in good faith.

The subdivisions of paragraph (c)(1) thereafter provide the following requirements:

> (i) All facts and circumstances considered. The advice [upon which the taxpayer relies] must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances. . . . In addition, the requirements of this paragraph (c)(1) are not satisfied if the taxpayer fails to disclose a fact that it knows, or reasonably should know, to be relevant to the proper tax treatment of an item.
> (ii) No unreasonable assumptions. The advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person. For example, the advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true . . . .
> (iii) Reliance on the invalidity of a regulation. A taxpayer may not rely on an opinion or advice that a regulation is invalid to establish that the taxpayer acted with reasonable cause and good faith unless the taxpayer adequately disclosed, in accordance with § 1.6662-3(c)(2), the position that the regulation in question is invalid.

[*23] Absence of reasonable cause could be demonstrated, notwithstanding reliance on an advisor, by showing that the taxpayer failed to comply with one or more of those requirements. We turn to the Commissioner's submissions to see whether he made such a showing.

In his pretrial memorandum (Doc. 57) and in his opening post-trial brief (Doc. 128), the Commissioner pointed out the failure of Murfam's Form 8283 to state the donor's basis in the contributed property, but he made no allegation disputing "reasonable cause" for that failure. In his post-trial answering brief (Doc. 136), the Commissioner's position about lack of "reasonable cause" is stated as follows:

> The partial Form 8283 attached to Murfam TMP's return . . . did not contain [a] fully completed appraisal summar[y] because [it] lacked sufficient information in Section B, Part 1 of the Form[]. . . . Dixon Hughes prepared [Murfam's return] in accordance with the records provided to Dixon Hughes by petitioners. See Tr. 877:10-14.[12] The tax return preparers could not report the correct information on the Forms 8283 because the correct information was not provided to them by petitioners. . . . Petitioners were in the best and perhaps only position to provide this information to their preparers. Petitioners have yet to indicate basis for each property separately. Entire record.

That is, the Commissioner argues that the Form 8283 lacked the basis information not because the advisors had advised that it could or should be omitted but because Murfam declined to provide it to those advisors.

The cited evidence does not make this showing. There is simply no evidence as to whether the advisors *asked* for basis information. There is no evidence as to whether Murfam *provided* basis information. To the extent there was basis information not provided by Murfam, there is no evidence to show *why* it was not provided. The reason that there is no such evidence is that the Commissioner did not cross-

---

[12] The cited transcript states the question: "From your conversations with the Murphys, what was your perception, as to whether the Murphys genuinely relied upon you and your firm to properly prepare these returns?" Mr. Robbins answered, "Well, I mean, we prepared their return entirely. I mean, it was—we would have reviewed their return just to make sure that it looks like that we had—there were no omissions, or whatever, but yes, they would have relied on us to take the data provided and prepare the return."

**[*24]** examine the witnesses on the point. Direct examination by Murfam's counsel included this exchange (Tr. 874):

> Q . . . In your dealings with the Murphys, through the preparation of the earlier returns and these returns, how responsive were they to providing you whatever information you and your firm requested?
>
> A They were very responsive. They had a very good staff there.

The Commissioner did not pursue the point—neither with the witnesses from the accounting firm nor with the Murphys. He now effectively asks us to draw a negative inference that Murfam deliberately withheld basis information from its advisors. Especially since the Commissioner bears the burden of proof on this issue, we decline to do draw such an inference against Murfam.

The record thus lacks explicit evidence on whether the blank basis boxes on Forms 8283 were the result of Dixon Hughes' advice or were instead due to Murfam's willful neglect. If Murfam bore the burden to prove reasonable cause, then that lack of evidence might warrant the conclusion that their omission was not due to reasonable cause, because there is no evidence of any advice or judgment by the CPAs to omit cost basis in the donated property. However, in this case the burden of proof is on the Commissioner to show a *lack* of reasonable cause for omission of cost basis on Murfam's Form 8283, because he raised this issue as new matter; and he must accordingly suffer the consequences of any gap in the record. Therefore, we hold that the Commissioner has failed to carry his burden to show a lack of reasonable cause, and that Murfam's omission of its cost basis in the donated property on Form 8283 will accordingly be excused for reasonable cause, so that we will not entirely disallow its charitable contribution deductions for failure to comply with the reporting requirements of section 170(f)(11) and Treasury Regulation § 1.170A-13(c). We will instead now proceed to determine whether Murfam has proved the value of its charitable contribution deduction for its donation of the Rose Tract easement.

> C. *The value of Murfam's easement donation*

> 1. *The method of valuing the conservation easement*

Generally, the amount of a charitable contribution deduction under section 170(a) for a donation of property is the "fair market value"

**[\*25]** of the property at the time of the donation. Treas. Reg. § 1.170A-1(c)(1). Treasury Regulation § 1.170A-1(c)(2) defines fair market value to be "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." With respect to valuing a donation of a partial interest in property, Treasury Regulation § 1.170A-7(c) provides that "[e]xcept as provided in § 1.170A-14, the amount of the deduction under section 170 . . . is the fair market value of the partial interest at the time of the contribution." And Treasury Regulation § 1.170A-14(h)(3)(i) in turn sets forth the following method for valuing a perpetual conservation restriction:

> [Sentence 2:] If there is a substantial record of sales of easements comparable to the donated easement (such as purchases pursuant to a governmental program), the fair market value of the donated easement is based on the sales prices of such comparable easements. [Sentence 3:] If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction. [Sentence 4:] The amount of the deduction in the case of a charitable contribution of a perpetual conservation restriction covering a portion of the contiguous property owned by a donor and the donor's family . . . is the difference between the fair market value of the entire contiguous parcel of property before and after the granting of the restriction.

The fair market value of property on a given date is a question of fact to be resolved on the basis of the entire record. *McGuire v. Commissioner*, 44 T.C. 801, 806–07 (1965); *see, e.g.*, *Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965). In this case, we do not have "a substantial record of sales of easements comparable to the donated easement", and we will therefore base our valuation on the before and after method. Treas. Reg. § 1.170A-14(h)(3)(i). To do so—

> If before and after valuation is used, the fair market value of the property before the contribution of the conservation restriction must take into account not only the current use

**[\*26]** of the property but also an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed, as well as any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use.

*Id.* subdiv. (ii); *see also Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986). A property's highest and best use is the "highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future". *Olson v. United States*, 292 U.S. 246, 255 (1934).

To show the value of the conservation easement in this case, as well as the property's highest and best use, the parties have offered the reports and testimonies of expert witnesses. *See* Rule 143(g). "Opinion testimony of an expert is admissible if and because it will assist the trier of fact to understand the evidence that will determine a fact in issue", and we evaluate expert opinions "in light of the demonstrated qualifications of the expert and all other evidence of value." *Parker v. Commissioner*, 86 T.C. 547, 561 (1986) (citing Fed. R. Evid. 702). Where experts offer competing estimates of fair market value, we decide how to weigh those estimates by, inter alia, examining the factors they considered in reaching their conclusions. *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962). We are not bound by the opinion of any expert witness, and we may accept or reject expert testimony in the exercise of our sound judgment. *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 294–95 (1938); *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 217 (1990). We may also reach a decision as to the value of property that is based on our own examination of the evidence in the record. *See Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

Having established the subject and method of valuation, as well as the scope of evidence with which to do so, we will now explain the basis of our valuation of the Rose Tract easement at issue as stated above in the findings of fact.

### 2. *The valuation of the Rose Tract easement*

The parties have stipulated that "the after-value of the Rose Tract real property (excluding timber) on December 27, 2010, was $5,801,000. The parties also agree that the before-value of the Rose Tract real

**[\*27]** property (excluding timber) on December 27, 2010, was $5,801,000 with the impact of the swine Certificates of Coverage beyond that as the remaining valuation issue." The parties further stipulated that the Certificates could have been converted to use in a farrow-to-wean facility. The parties disagree as to the value of the forfeited Certificates and the resulting impact, if any, on the value of the Rose Tract easement.

Murfam relies on the expert report of Andy E. Piner[13] to assert that the highest and best use of the Rose Tract before donation of the conservation easement was to operate a farrow-to-wean[14] hog-farming facility (with growth of timber on the remaining acreage) and that the value attributable to the conservation easement is $5,669,793.[15] We found him qualified, competent, and persuasive. The Commissioner disputes Mr. Piner's qualifications to appraise a conservation easement and a farm, his use of the direct cost to construct a farrow-to-wean facility supplied by the Murphys, and his capitalization rate used to value the farrow-to-wean operation. The Commissioner instead offers the expert report of Matthew Hawk, who valued the Rose Tract for use as a feeder-to-finish facility but ultimately concluded that the cost of

---

[13] Mr. Piner's expert report is a complete copy of the qualified appraisal that he prepared for Murfam and that was attached to Murfam's return.

[14] The Commissioner questions Mr. Piner's conclusion that the pre-contribution highest and best use of the Rose Tract was a farrow-to-wean facility because the cover letter of his appraisal report states that "there are approximately 1,100–1,200 acres that could be utilized with a finishing farm facility that has been permitted by the State of North Carolina." However, despite this misstatement on the cover letter and again in the "Purpose and Intended Use of the Appraisal" section of the appraisal report, the body of the report and the substantive discussion of highest and best use consistently value the Rose Tract on the basis of the Certificates being converted for use as a farrow-to-wean facility. Furthermore, in valuing the Rose Tract's highest and best use, Mr. Piner (or any appraiser) is required to consider the "most profitable use", and the record in this case establishes that "farrow-to-wean" is a more profitable use than "feeder-to-finish". Ultimately, the parties stipulated that the Certificates "can be converted from a feeder-to-finish facility to a farrow-to-wean facility". Consequently, this discrepancy in Mr. Piner's report is immaterial, and it therefore does not impact our view of Mr. Piner's credibility as a valuation expert or the determinations made in his report.

[15] At trial Mr. Piner reduced his valuation of the Certificates (and therefore his valuation of the conservation easement) to $5,669,793 from the $5,744,600 stated in his original appraisal report. This reduction of $74,807 in the claimed value of the Rose Tract easement is the net effect of increasing the number of sows that a farrow-to-wean facility could accommodate from 18,317 to 19,538 (and thereby increasing the value of the certificates) but also increasing the post-contribution value of Rose Tract to the stipulated figure of $5,801,000 (which reduces the value of the contribution).

[*28] constructing such a facility exceeded its resulting value and was therefore financially unfeasible. Mr. Hawk accordingly determined that the highest and best use of the Rose Tract both before and after donation of the conservation easement was to grow timber (valued at $5,801,000) and that the value of the conservation easement was therefore zero.

However, Mr. Hawk did not consider the effect of (and at the time he made his valuation was apparently not aware of the possibility of) converting the Certificates to a farrow-to-wean facility on the value of the Rose Tract easement, and the Commissioner later stipulated that the Certificates could be so converted. Mr. Piner's valuation of the Rose Tract as a farrow-to-wean farm is thus largely unanswered. For example, neither the Commissioner nor Mr. Hawk presented alternative figures to counter Mr. Piner's assertions that a farrow-to-wean facility on the Rose Tract could accommodate 19,538 sows which would then birth an average of 21 pigs per sow, which would be sold at $13.50 per pig (yielding potential annual gross income of approximately $5,539,023), that operating expenses for a farrow-to-wean facility would be approximately 48% of gross income ($2,658,731), and that the total development cost to construct a farrow-to-wean facility would be $20,045,667. In fact, the Commissioner presumes these figures (albeit begrudgingly) in his own attempt to value the Rose Tract as a farrow-to-wean facility in his post-trial brief.

The only one of Mr. Piner's figures that the Commissioner directly disputes in that attempt is Mr. Piner's applied capitalization rate of 10.25%, and the Commissioner argues that the capitalization rate should instead be 13.35%. The Commissioner purports to derive his asserted capitalization rate of 13.35% from six sales of allegedly comparable farrow-to-wean facilities, and he argues that "[d]eriving capitalization rates from comparable sales is the preferred technique when sufficient information about sales of similar, competitive properties is available."

Murfam and Mr. Piner point out, however, that the six sales offered by the Commissioner are in fact not sales of comparable properties but rather are sales of farrow-to-wean facilities that are a decade or more old and that had a capacity of less than 3,000 sows, whereas Murfam and Mr. Piner valued the highest and best use of the Rose Tract on the basis of a farrow-to-wean facility that was brand new and that had a capacity of 19,538 sows. According to Mr. Piner's testimony, the Commissioner's attempt to derive a capitalization rate for the prospective farrow-to-wean facility on the Rose Tract is "taking

**[\*29]** capitalization rates from 15 to 25-year-old buildings and apply[ing them] to a brand-new structure, which is totally inappropriate" without adjusting the capitalization rate accordingly.

Another flaw in the Commissioner's asserted use of these six sales to derive a less favorable capitalization rate for valuing the Rose Tract as a farrow-to-wean facility is the methodology of computing the capitalization rate. For each of the six sales offered by the Commissioner, he computes the respective capitalization rate by dividing the facility's net annual income by the overall sale price. Mr. Piner determined his capitalization rate using the mortgage-equity method, "which produces a weighted average cost of capital based on the cost of debt and equity financing for the subject property." *LeFrak v. Commissioner*, T.C. Memo. 1993-526, 66 T.C.M. (CCH) 1297, 1302. Considering that the highest and best use of the Rose Tract before donation of the conservation easement was to build a new high-capacity farrow-to-wean facility, we view the mortgage-equity method of calculating the capitalization rate as the more credible method.

We note that the Commissioner challenges neither Mr. Piner's use of the mortgage-equity method nor his application of the capitalization rate to determine the value of the Certificates but challenges only the inputs used by Mr. Piner to determine the capitalization rate itself. The Commissioner argues that Mr. Piner's report "lacks support for many of his conclusions because he either relies on information that lacks a verifiable source or utilizes figures that are not explained or derived from any meaningful analysis." The Commissioner specifically criticizes Mr. Piner's lack of stated market data to support a 4.5% interest rate, a 15-year financing term, a 90% loan-to-value ratio, and a 20% equity capitalization rate.

However, Mr. Piner testified that he based the input figures in his report on contemporaneous discussions with market lenders. We view his testimony as credible, and it is undisputed. The Commissioner does not offer alternative figures for the interest rate, financing term, loan-to-value ratio, or equity capitalization rate, nor did he cross-examine Mr. Piner on the correctness of his input figures.[16] The

---

[16] We take judicial notice that the applicable federal rate in December 2010 for long-term debt instruments, compounding annually, was 3.53%. Rev. Rul. 2010-29, 2010-50 I.R.B. 818, 819. It appears, therefore, that Mr. Piner used a more conservative, higher rate of 4.5%—evidently on the basis of his consultations with market participants—than he could have used at the time of his appraisal, and that doing so was disadvantageous to Murfam.

**[\*30]** Commissioner merely complains that the input figures are not explained in Mr. Piner's report. But despite Mr. Piner's imperfect explanation, he is a credible valuation expert who used a satisfactory method to determine a capitalization rate, and the Commissioner's only response is a capitalization rate based on sales of properties that are not comparable to the Rose Tract's proposed use as a new farrow-to-wean facility. We therefore adopt the mortgage-equity method for determining the capitalization rate, as well as the input figures used in Mr. Piner's report, with one correction: Mr. Piner calculated the capitalization rate to be 10.2619%, and then for reasons he did not explain rounded it *down* to 10.25%. However, even a minor reduction in the capitalization rate would increase the valuation of the Rose Tract (to the advantage of Murfam), and we therefore hold that the proper capitalization rate is Mr. Piner's true calculated figure of 10.2619%.

The Commissioner also criticizes as self-serving Mr. Piner's use of the direct cost to construct a farrow-to-wean facility as supplied by the Murphys. However, we do not accept this criticism. As we have found, the Murphy family is a multi-generational hog-farming family with substantial expertise in their industry. We conclude they were able to provide credible data on the cost to construct a large farrow-to-wean facility. At the time of Mr. Piner's appraisal, the Murphys were the top hog farmers in North Carolina and had previously constructed two farrow-to-wean facilities with capacities of 4,400. Mr. Piner also corroborated the cost data given to him by the Murphys with other neutral developers of large swine farm facilities.[17]

Altogether, we adopt Murfam's method of valuing the highest and best use of the Rose Tract as a farrow-to-wean facility with a capacity for 19,538 sows, based on an average of 21 pigs per sow per year at a price of $13.50 per pig, yielding a projected annual gross income of approximately $5,539,023, and net operating income of $2,880,292. Using the capitalization rate of 10.2619% yields an overall value of $28,067,824, from which we deduct the total development cost of $21,381,899 (i.e., the $20,045,667 cost of constructing an 18,317-capacity facility (as in Mr. Piner's original valuation) plus additional costs of $1,336,232 (as in his revised determination and trial testimony),

---

[17] Murfam's direct cost data is the only reliable figure in our record. The Commissioner did not engage a valuation expert to estimate the cost of constructing a large farrow-to-wean facility, although since the filing of the petition Murfam has asserted that highest and best use of the Rose Tract before donation was to operate a high-capacity farrow-to-wean facility, and the Commissioner has been well aware of the method by which Murfam valued that use.

**[\*31]** for a difference of $6,685,925 as the value of the farrow-to-wean hog-farming facility. We then add the value (based on stipulated facts) of the timber on the remaining acreage of the Rose Tract—$4,752,282— to the value of the farrow-to-wean hog-farming facility to compute the total value of the Rose Tract before the easement donation— $11,438,207. We then subtract the agreed-to value of the Rose Tract after the easement donation—$5,801,000—to arrive at $5,637,207 as the value attributable to the forgone use of the hog-farming certificates, and therefore the value of the Rose Tract easement.

III.  *Penalties under section 6662*

The Commissioner asserts that Murfam's deduction of the Rose Tract easement is subject to the gross valuation misstatement penalty under section 6662(h), or, in the alternative, the penalty for substantial valuation misstatement under section 6662(e), for substantial understatement of income tax under section 6662(d), or for negligence under section 6662(c). For the reasons explained below, we hold that because of reasonable cause, Murfam is not subject to any penalty under section 6662.

A.  *Penalty principles*

Section 6662(a) imposes an accuracy-related penalty "equal to 20 percent of the portion of the underpayment to which this section applies" upon a taxpayer who underpays his tax because of, inter alia, "[n]egligence or disregard of rules or regulations", a "substantial understatement of income tax", or a "substantial valuation misstatement". § 6662(b)(1)–(3). An understatement of income tax is substantial if it exceeds the greater of "10 percent of the tax required to be shown on the return for the taxable year" or $5,000. § 6662(d)(1)(A). For 2010, the year at issue, a substantial valuation misstatement exists if "the value of any property . . . claimed on any return . . . is 150 percent or more of the amount determined to be the correct amount of such valuation". § 6662(e)(1)(A). None of these penalties will be imposed where the taxpayer had "reasonable cause". § 6664(c)(1).

In the case of a "gross valuation misstatement"—i.e., where the value of property claimed on the return is 200% or more of the amount determined to be the correct valuation—the rate of the accuracy-related penalty is increased to 40%. § 6662(h)(1) and (2)(A)(i). There is no reasonable cause defense available under section 6664(c) to a gross valuation misstatement. § 6664(c)(3).

**[\*32]** On the basis of these principles, the record in this case, and the valuation we determined above in Part II.C.2, we will now determine which penalties, if any, are applicable with respect to Murfam's donation of the Rose Tract easement.

B.  *Section 6662 penalties with respect to Murfam*

Section 6221, as in effect at the relevant time, provided generally that, in a TEFRA partnership case, "the applicability of any penalty . . . which relates to an adjustment to a partnership item . . . shall be determined at the partnership level."  Section 6226(f) likewise states that our jurisdiction in TEFRA partnership cases is limited to "the applicability of any penalty . . . which relates to an adjustment to a partnership item."  Treasury Regulation § 301.6221-1(c) further provides that "[p]artnership-level determinations include all the legal and factual determinations that underlie the determination of any penalty . . . other than partner-level defenses".  And Treasury Regulation § 301.6226(f)-1(a) provides that "the court has jurisdiction in the partnership-level proceeding to determine any penalty . . . that relates to an adjustment to a partnership item.  However, the court does not have jurisdiction in the partnership-level proceeding to consider any partner-level defenses to any penalty . . . that relates to an adjustment to a partnership item."  Accordingly, within our jurisdiction in this TEFRA case is the ability to determine the applicability of any section 6662 penalty; but to the extent that defenses (such as reasonable cause) to any penalties determined depend on the particular aspects of a partner-level return, we do not have jurisdiction in this TEFRA case to consider them.

1.  *Valuation misstatement penalty*

Murfam originally claimed on its partnership return a charitable contribution deduction of $5,744,600 for its donation of the Rose Tract easement, and above in Part II.C.2 we determined the correct deduction to be $5,637,207.  Murfam therefore overstated on its return the value of the Rose Tract easement not by 200% or 150% but by approximately 2%.  Accordingly no section 6662 penalty founded on a substantial or gross valuation misstatement is applicable.  *See* § 6662(e)(1)(A), (h)(2)(A)(i).

2.  *Other accuracy-related penalty*

Having held the valuation penalties inapplicable, we are left with the 20% penalty attributable to an underpayment due to a substantial

**[\*33]** understatement of income tax or to negligence or disregard of rules or regulations applies.

### a. *Substantial understatement*

Whether a TEFRA partnership adjustment results in a "substantial underpayment" by a given partner is an issue that must be determined at the partner level, so in this partnership-level action we do not have jurisdiction to determine "whether any applicable threshold underpayment of tax has been met with respect to the partner". Treas. Reg. § 301.6221-1(d). Rather, we "determine the *applicability* of the understatement . . . penalty, at the partnership level". *VisionMonitor Software, LLC v. Commissioner*, T.C. Memo. 2014-182, at \*16; *see also Triumph Mixed Use Invs. III, LLC v. Commissioner*, T.C. Memo. 2018-65, at \*49–52. The Murfam partnership did overstate its charitable contribution deduction, so insofar as the partnership is involved, there is an "understatement of income tax" for purposes of section 6662(b)(2), and the penalty is "applicable"—subject to partnership-level defenses, such as the "reasonable cause" defense based on reliance on professional advice, under the principles of *Neonatology Associates* discussed above in Part II.B.2.c.

We hold that the partnership-level reasonable cause defense overcomes any resulting penalty, because the Commissioner did not carry his burden to show an absence of reasonable cause for any substantial understatement. Rather, the evidence shows that Murfam engaged a competent appraiser who valued the Rose Tract easement using a credible method, and that the valuation was within 2% of the amount we have determined to be the correct value. Furthermore, Murfam hired professional, reputable accountants to prepare all the returns associated with the easement donation, and Murfam provided all information necessary to prepare the returns that was requested of it. These facts demonstrate that Murfam acted in good faith with respect to its valuation and reporting of the Rose Tract easement donation, and that any substantial understatement that results in the liability of a partner should be excused for reasonable cause, on the basis of the advice of professional tax advisors and return preparers. *See* § 6664(c); *see also* Treas. Reg. § 1.6664-4(b).

### b. *Negligence*

The same facts (discussed immediately above) that support a partnership-level reasonable cause defense as to a substantial

**[\*34]** understatement penalty also support a defense against the charge of negligence by the partnership.

In his post-trial brief, the Commissioner supports his contention of negligence by making a twofold criticism of Murfam's motives: "Murfam TMP's grant of the easement was not a 'contribution or gift,' but a strategy [1] to reduce Murfam TMP's tax liability and [2] to keep the Rose Tract for personal recreational use, as it had always been." Doc. 128, at 339. Neither of these criticisms has merit. First, Murfam's tax avoidance motive does not affect its entitlement to the charitable contribution deduction for its donation of a qualified conservation contribution pursuant to section 170(h). It is quite true that Murfam's donation involved "a strategy to reduce . . . tax liability"; but the very purpose of section 170(h) is to incentivize such contributions by offering a tax deduction. The Code does not induce such contributions by offering the deduction only to deny the deduction because the taxpayer responded to the incentive. Second, it is true, for some charitable contribution deductions, that a finding that the donor retained some benefit to himself would contradict the claim of a gift and would defeat the deduction, since the donor might thereby have failed to give his "entire interest in such property", contrary to section 170(f)(3). But Congress's enactment of the deduction for qualified conservation contributions (including an easement granted in perpetuity, Treas. Reg. § 1.170A-14(b)(2)) expressly permits a deduction for a partial interest, *see* § 170(f)(3)(B)(iii), and consequently a donation of a conservation easement will almost always involve the donor's retaining an interest in the property. What the donor permissibly retains he may licitly enjoy, provided his use does not contradict the conservation purpose of the easement for which he claimed a deduction.

IV. *Conclusion*

We hold that Murfam did not satisfy the appraisal summary requirements of section 170(f)(11) in connection with the claimed charitable contribution deduction at issue, but that its failure to do so is excused for reasonable cause because the Commissioner, in raising this issue as new matter in this litigation, failed to carry his burden to show an absence of reasonable cause. The parties have stipulated that Murfam's donation of the Rose Tract easement satisfies the requirements of section 170(h) to be a "qualified conservation contribution" for which a charitable contribution is permitted, but disagree as to the value of the easement and the amount of the associated deduction. Having considered all evidence presented by the

**[*35]** parties, we find the value of the Rose Tract easement to be $5,637,207. Finally, we hold that no penalties apply with respect to Murfam's donation of the Rose Tract easement on account of reasonable cause.

To reflect the foregoing,

*Decision will be entered under Rule 155.*